(No. 63771.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TAFFORD HOLMAN, Appellant.

*Opinion filed October 25, 1989.—Rehearing*
*denied December 4, 1989.*

136

G. Joseph Weller, Deputy Defender, and Paul J. Glaser, Assistant Defender, of the Office of the State Appellate Defender, of Elgin, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and William P. Pistorius, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendant, Tafford Holman, was convicted in the circuit court of Will County of felony murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(3)), intentional murder (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(a)(1)), armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2) and home invasion (Ill. Rev. Stat. 1979, ch. 38, par. 12—11(a)(1)). Defendant was sentenced to death for the felony murder

conviction, to 60 years' imprisonment for the intentional murder conviction, and to 40 years' imprisonment for the armed violence and home invasion convictions. This court affirmed certain of his convictions but vacated defendant's sentences and remanded to the circuit court of Will County for a new sentencing hearing. (*People v. Holman* (1984), 103 Ill. 2d 133.) The specific facts concerning defendant's convictions and previous sentences are set forth in detail in that opinion and will not be repeated except where necessary to the issues discussed herein.

At the resentencing hearing, a jury found defendant eligible for the death penalty based on the presence of the statutory aggravating factor that the murder had been committed during the course of an armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)). The jury also found no mitigating circumstances sufficient to preclude imposition of the death penalty (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)). On May 8, 1986, the trial court judge sentenced defendant to die by lethal injection for the felony murder conviction and to concurrent terms of 30 years each for the armed violence and home invasion convictions. The death sentence was stayed (107 Ill. 2d R. 609) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). In light of the United States Supreme Court's decisions in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, this court, on October 26, 1987, remanded the case to the circuit court of Will County to conduct a hearing on defendant's claim that the State unconstitutionally discriminated against blacks in its exercise of peremptory challenges. This court subsequently entered an order clarifying that the October 26, 1987, order applied only to the State's use of peremptory challenges at the resentencing hearing, not to

the State's use of peremptory challenges at defendant's trial.

Defendant argues on appeal that his convictions in this case should be reversed because the State improperly excluded blacks from serving on the jury at his original trial. Defendant also argues that he was denied a fair sentencing hearing on remand because: (1) the jury at the resentencing hearing was unfairly selected because biased venirepersons were not properly excused for cause; (2) a comment by the sentencing court judge at the start of the resentencing hearing unfairly swayed the jury in favor of the State; (3) the introduction and use of defendant's prior uncounseled juvenile delinquency adjudication constituted error; (4) defendant was unfairly denied the right to present evidence in mitigation; (5) certain testimony was erroneously admitted; and (6) defendant was denied effective assistance of counsel at the resentencing hearing. Defendant also argues: (1) that the death sentence is an excessive penalty in this case and (2) that the Illinois death penalty statute is unconstitutional. Finally, defendant claims that the sentencing court judge erred at the *Batson* hearing conducted on remand in concluding that defendant failed to establish a *prima facie* case of discrimination by the State in its use of peremptory challenges. Defendant does not challenge the sentences imposed on him by the sentencing court for his armed violence and home invasion convictions.

Defendant's first contention is that the State unconstitutionally exercised its peremptory challenges to exclude blacks from the jury at his original trial. As a result, defendant argues that we should remand this case to the trial court to conduct a hearing on defendant's claim in accordance with the United States Supreme Court's decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. We note

that defendant first raised the issue of the State's allegedly discriminatory use of peremptory challenges in his initial appeal to this court. However, this court did not address the issue in its initial opinion in this case. (*People v. Holman* (1984), 103 Ill. 2d 133.) We therefore address it here.

In *Batson*, the Supreme Court held for the first time "that a defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1722-23.) Prior to *Batson*, a defendant could only establish a *prima facie* case of discrimination by showing that the State had engaged in a pattern of excluding blacks from juries in a series of cases. See *Swain v. Alabama* (1965), 380 U.S. 202, 227, 13 L. Ed. 2d 759, 776, 85 S. Ct. 824, 839.

In *Allen v. Hardy* (1986), 478 U.S. 255, 258, 92 L. Ed. 2d 199, 204, 106 S. Ct. 2878, 2879-80, the Court held that "*Batson* should not be applied retroactively on collateral review of convictions that became final before [the Court's] opinion was announced." However, in *Griffith v. Kentucky* (1987), 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716, the Court held that the rule announced in *Batson* should apply retroactively to all cases which had been pending on direct review or were not yet final at the time *Batson* was decided. The Court stated that the term "final" meant "a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." (*Griffith*, 479 U.S. at 321 n.6, 93 L. Ed. 2d at 657 n.6, 107 S. Ct. at 712 n.6.) Defendant argues that in light of the Court's decision in *Griffith*, this case should be remanded to the circuit court for a hearing in

accordance with the rule announced in *Batson*. We disagree.

Defendant, citing the definitions of "conviction" and "judgment" that are set forth in the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—1—5, 1005—1—12), argues that the circuit court's decision did not constitute a "conviction" until defendant was sentenced. Since this court vacated the sentences from the initial trial, defendant claims that there could not have been a "conviction" until a new sentence was imposed after the resentencing hearing which, defendant notes, occurred after *Batson* was decided.

The problem with this argument is that even if we assume, without deciding, that defendant's interpretation of the Unified Code of Corrections is correct, defendant fails to explain, and we perceive no reason, why the Unified Code of Corrections' definitions of "conviction" and "judgment" should apply here. Instead, we find it more appropriate in this case, as this court previously did in defendant's initial appeal (see *Holman*, 103 Ill. 2d at 179), to consider the term "conviction" as meaning the finding that defendant was guilty of the crimes for which he was charged, and as being something separate and distinct from the term "sentence."

Applying the test set forth in *Griffith*, 479 U.S. at 321 n.6, 93 L. Ed. 2d at 657 n.6, 107 S. Ct. at 712 n.6, we find that the decision in *Batson* should not be applied in assessing whether the State discriminated against blacks in its use of peremptory challenges prior to defendant's initial trial. This court handed down its decision in defendant's direct appeal in 1984, almost two years before *Batson* was decided. In that initial decision, we explicitly affirmed his convictions of felony murder, armed violence and home invasion. (*Holman*, 103 Ill. 2d at 179.) The United States Supreme Court subsequently finally denied defendant's petition for *certiorari* in April

1985, one year before *Batson* was decided. (*Holman v. Illinois* (1985), 471 U.S. 1050, 85 L. Ed. 2d 342, 105 S. Ct. 2044.) Thus, although defendant could still collaterally attack his convictions through the Post-Conviction Hearing Act (Ill. Rev. Stat. 1987, ch. 38, par. 122—1 *et seq.*), or through a Federal *habeas corpus* proceeding (28 U.S.C. §2254 (1982)), defendant had exhausted all avenues of direct appeal concerning his convictions of felony murder, armed violence and home invasion before *Batson* was decided. We therefore reject defendant's argument that this case should be remanded for a *Batson* hearing concerning the State's use of peremptory challenges at the original trial.

We next consider contentions raised as to the sentencing hearing on remand. Defendant first claims that the sentencing judge erred in refusing to excuse three venirepersons for cause. According to defendant, one venireperson should have been excluded for cause because his testimony during *voir dire* indicated that the venireperson believed defendant should be sentenced to death unless the venireperson could be persuaded otherwise. Such a viewpoint, defendant argues, would improperly place the burden of proof at the second stage of the sentencing hearing upon defendant.

The standard for determining whether a venireperson in a capital case should be excluded for cause because of his views concerning capital punishment "is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852, quoting *Adams v. Texas* (1980), 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526.) Our court has further stated that the denial of a motion to dismiss a venireperson for cause based upon his views in favor of the death penalty does not constitute "error

unless a defendant shows that a 'juror on his jury believed that the death penalty should be imposed in every case where a defendant is convicted of murder.' " *People v. Brisbon* (1985), 106 Ill. 2d 342, 360, quoting *People v. Caballero* (1984), 102 Ill. 2d 23, 45.

In reviewing a trial judge's decision whether to excuse a venireperson for cause, we must view the venireperson's statements "not in isolation but as a whole." (*People v. Gaines* (1981), 88 Ill. 2d 342, 357.) Accordingly, it is necessary to set forth the following lengthy colloquy which occurred between the venireperson, the sentencing judge, and the defense counsel:

"EXAMINATION BY [DEFENSE COUNSEL]:

Q. Now, you understand that all people who are convicted of murders do not get the death penalty?

A. Right.

Q. Is that acceptable to you, that there are people who commit a murder who don't get the death penalty?

A. Well, to my estimation it all depends, I mean, the circumstances. I couldn't really answer that right now.

Q. Do you have a feeling as you sit there that anyone who commits a murder should receive the death penalty?

A. To my estimation if they're convicted I would think so.

Q. Okay. [Defendant] has been convicted of murder, so based on your last statement as you sit there now is it your belief he should receive the death penalty?

A. Yes.

Q. Okay. Now this belief you have that people who are convicted of murder should receive the death penalty, has this been a longstanding belief?

A. No, not really.

Q. Okay. When did you first—

A. Well just, every time you open the paper, turn on the television that's all you hear.

Q. Okay. And based on your observation in life you've now formed an opinion that if convicted he probably should receive the death penalty and in any event as you

sit there now you're kind of leaning towards the fact [defendant] should receive the death penalty?

A. Yes.

Q. Now understand that as [defendant's] attorney I'm going to present evidence which I want to convince the jurors to accept which will lead them to a decision [defendant] should not receive the death penalty.

Now are you telling me that I'm going to have to change your mind?

A. I would say so.

Q. And I'm going to have to present evidence which not only must convince you, but must also change your mind based on the decision that you've made already, just based on his conviction?

A. Right.

\* \* \*

Q. Good. Now this basis of your opinion if I can state at the time generally [*sic*] is your general opinion that anyone who commits a murder should probably receive the death penalty. Would that be a pretty good statement?

A. If it was a proven fact, yes.

\* \* \*

Q. Okay. Now do you think its possible I could change your mind?

A. Well, it's been done.

Q. Okay. But it's going to take a little bit of effort on my part?

A. I would say so, yes.

Q. It's going to take more effort on my part to change your mind than you obviously have already decided that?

A. Yes.

Q. On the State's side without hearing any evidence, is that what you're saying?

A. Yes, to a certain extent.

\* \* \*

EXAMINATION BY THE COURT:

Q. Sometimes, sir, a person is not able to quite clearly articulate or set forth his feelings or basis for them.

You've indicated to [defense counsel] that in your opinion anyone convicted of murder should die. Right? If proven guilty.

A. Right.

* * *

Q. Now you understand that part of the instructions that you'll be given in the first part of the first portion are going to be that there are certain types of murders which qualify for the death penalty. Are you aware of that? That not all murders qualify for the possible imposition of the death penalty.

A. No, not really.

Q. Okay. Does that make a difference in how you view convictions for murder, number one?

A. Yeah, that part, yes.

Q. Okay. Now if the jury were to find that this is one of the types for which the death sentence could be imposed, if the jury would so vote, are you already of the opinion now that as you sit there right now in your mind [defendant] should be convicted to death, should be sentenced to death unless [defendant] can convince you that he should not be?

A. Yes.

Q. So you're not going into this on an even keel. You don't have an open mind.

A. No not really.

Q. Right now. You're sitting there saying, 'As far as I'm concerned I'm going to vote that he die, unless [defense counsel]—

A. No.

Q. —can bring me enough testimony to overcome my belief.' Is that what you're saying?

A. No, not that way.

Q. Okay. Then explain what you're trying to tell us.

A. Like I say, certain circumstances. I don't know the circumstances or I don't know nothing about it. And—

Q. All right. But how does that square with your statement that all convicted murderers should die?

A. Well, it's just that I hear so much of it and that, and like I say, every time you turn on television or open the paper that's all you—

Q. Let me go back, sir, to this morning. You indicated that you could be a fair and impartial juror, that you would have an open mind, you would listen to all the testimony, you would consider the law and base your decision on that.

Is that what you told us this morning?

A. Yes, I think so.

Q. Okay. Are you now telling us something different, that you've already got your mind made up as to what the sentence should be?

A. No, not as far as this case. Like I say, I don't know this case. So I would have to listen, that's all. And then—

Q. All right. As you sit there right now, what is your opinion, do you have one? Or are you—you've got none until you hear it?

A. That's—yes, that's what it is.

Q. That's what it is?

A. Yes.

Q. Right now you're not in favor of giving it to him, and [defense counsel] has convinced you not to give it, but you're going to listen to see whether or not either side is going to convince you as to what your verdict should be?

A. Yes.

\* \* \*

[RE]EXAMINATION BY [DEFENSE COUNSEL]:

Q. A few moments ago I asked you if I was going to have to change your mind, and you said yes.

A. Yes.

Q. Is that answer still yes?

A. Yes. That's what I say. I don't know the case.

Q. I understand that. But when I ask you the question am I going to have to change your mind, I was under the impression that you had stated that as you sat there you were in favor of the State feeling that [defendant] should receive the death penalty, but that you would keep an

open mind for me to change your mind. That's what you said a few minutes ago.

A. Yes.

Q. Is that your statement at this time?

A. Yes.

Q. I'm not trying to put words in your mouth. When I say as you sit there, are you leaning towards the State, have you developed an opinion based on watching T.V. or the newspapers or whatever that you believe that [defendant] should receive the death penalty, but you'll at least keep an open mind for me to change your mind as to that fact?

A. Yes.

Q. That's what your feeling is?

A. That's what I was trying to say."

At the conclusion of this questioning, defendant moved that the venireperson be excused for cause. The sentencing judge, however, denied the motion, stating:

"The inquiries by the Court prior to the last inquiries by defense counsel clarified what the venire person actually was trying to convey, and from his answers he indicated that he does have an open mind now and will follow the evidence and the law and decide the case on that basis, even though he does indicate a strong preference for the imposition of the death sentence. He does indicate that he can be fair and impartial, follow the law."

In reviewing the sentencing judge's ruling, we note initially that "[t]he determination of whether or not to allow a challenge for cause is within the sound discretion of the trial judge." (*People v. Hyche* (1979), 77 Ill. 2d 229, 239.) We also note that where there are "any inconsistencies in the answers given by a venireman, we recognize the superior position of the trial judge to ascertain the meaning which the one being questioned intends to convey." (*People v. Free* (1983), 94 Ill. 2d 378, 403.) In light of these principles and the sentencing judge's explicit finding in denying defendant's motion, we cannot conclude that the venireperson's inconsistent statements

indicated that he would be unable to perform "his duties as a juror in accordance with his instructions and his oath" (*Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52, 105 S. Ct. at 852), or that he "believed that the death penalty should be imposed in every case where a defendant is convicted of murder" (*Brisbon*, 106 Ill. 2d at 360). We therefore hold that the trial judge's decision to not exclude the venireperson for cause did not constitute error.

Defendant next argues that two venirepersons who stated during *voir dire* that they did not believe that persons could be rehabilitated "under the present prison system" should have been excused for cause. According to defendant, the venirepersons' statements indicated that they could not consider the full range of sentencing alternatives available to defendant which, defendant claims, would preclude them from making the " 'highly subjective, unique, individualized judgement' " that is required in capital cases. *Turner v. Murray* (1986), 476 U.S. 28, 33, 90 L. Ed. 2d 27, 35, 106 S. Ct. 1683, 1687, quoting *Caldwell v. Mississippi* (1985), 476 U.S. 320, 340 n.7, 86 L. Ed. 2d 231, 246 n.7, 105 S. Ct. 2633, 2645 n.7.

While it is true that the venirepersons expressed doubts about the possibility that anyone could be rehabilitated in our current prison system, both also repeatedly stated that they would make their sentencing decisions based upon the evidence presented at the hearing and that they believed that they could vote against imposition of the death penalty. Defendant has thus failed to demonstrate that either venireperson should have been excused for cause based on the standards set forth in *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52, 105 S. Ct. at 852, or *Brisbon*, 106 Ill. 2d at 360. Furthermore, none of the cases cited by defendant support his argument. *People v. Cole* (1973), 54 Ill. 2d 401, 413-

15, and *People v. Cravens* (1941), 375 Ill. 495, 496-98, merely stand for the proposition that a venireperson may have to be excused for cause if she is acquainted with the defendant. *People v. Stack* (1986), 112 Ill. 2d 301, 310-13, and *People v. Zehr* (1984), 103 Ill. 2d 472, 476-78, establish that it may constitute reversible error to preclude a defendant from inquiring during *voir dire* into a venireperson's views concerning certain fundamental legal propositions. Clearly, the principles enunciated in these four cases are not implicated here, as there has been no allegation that the venirepersons knew defendant or that defendant was precluded from inquiring into their beliefs. Consequently, we do not agree that the sentencing judge erred in refusing to excuse the venirepersons for cause.

Defendant next argues that a statement made by the sentencing judge to the jury improperly served to enlist the sympathies of the jurors in favor of the State. The statement complained of was as follows:

> "This morning we received the sad news that Mr. Edward Petka, the State's Attorney who has been present during the jury selection, his mother passed away yesterday. However, [another assistant State's Attorney] is going to proceed with the case. And after Mr. Petka's services and funeral for his mother, if we're still in session, he undoubtedly will also appear."

According to defendant, the judge's statement conveyed to the jury the impression that the judge was partial toward the State. (See *People v. Lewerenz* (1962), 24 Ill. 2d 295, 300-01.) Defendant also claims that the statement was analogous to the types of statements condemned by this court which call attention to a crime victim's family. (See *People v. Bernette* (1964), 30 Ill. 2d 359, 370-72; *Filippo v. People* (1906), 224 Ill. 212, 217.) We disagree.

In *Lewerenz*, 24 Ill. 2d at 301, this court stated that "[j]urors are quick to perceive any leaning of the court and place great reliance upon what he says and does, so that his statements and intimations are liable to have the force of evidence and be most damaging to an accused." In that case, the trial judge, "[o]n no less than sixteen occasions during trial," berated defense counsel for making routine objections to the introduction of evidence. (*Lewerenz*, 24 Ill. 2d at 300-01.) This court held that the trial judge's repeated demonstrations of hostility toward defense counsel constituted prejudicial error. (*Lewerenz*, 24 Ill. 2d at 301.) The sentencing judge's single, isolated comment in this case, in which he briefly explained to the jury why the State's Attorney who had conducted *voir dire* was absent, can hardly be viewed as indicating a bias in favor of the State or against defendant.

We similarly find defendant's analogy to *Bernette* and *Filippo* to be inapposite. The rule established in those cases is "that where testimony in a murder case respecting the fact the deceased has left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial." (*Bernette*, 30 Ill. 2d at 371; see also *Filippo*, 224 Ill. at 217.) The judge's statement here clearly was not presented in a manner which would cause the jury to believe that the prosecutor's mother's death was material to the case and therefore does not constitute reversible error.

Defendant's next argument concerns the State's use of defendant's 1966 juvenile delinquency adjudication at the second stage of the sentencing hearing. The State's first witness at this stage of the hearing was Clifford Erwin, who testified that in February 1966, he was an investigator for the Joliet police department. Erwin testified that at that time, defendant and two other youths kidnapped, beat and sexually assaulted a man whom

Erwin referred to as a "disabled veteran." Erwin testified that as a result of this conduct, defendant was adjudicated a delinquent, placed in the custody of the Illinois Youth Commission for six months, and committed to the Sheridan Boys' Home. The State subsequently introduced into evidence certified copies of the delinquency petition and commitment orders from the 1966 adjudication.

Defendant claims that evidence of the adjudication was inadmissible under section 2—10(1)(b) of the now-repealed Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 702—10(1)(b)), and was also inadmissible because the adjudication had been uncounseled. We need not address these arguments, however, as we find that even if evidence of the adjudication was improperly admitted, its admission was harmless. The reason the State sought to introduce the evidence was to negate the statutory mitigating factor of "no significant history of prior criminal activity." (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(c)(1).) Besides the 1966 juvenile adjudication, the State also established that defendant had two previous felony convictions: a 1970 armed robbery conviction and a 1974 robbery conviction. Based upon these other convictions, we conclude that even if the 1966 juvenile adjudication had been disregarded, the jury would have still found that defendant had a "significant history of prior criminal activity." See *People v. Stewart* (1984), 101 Ill. 2d 470, 494.

Defendant further contends that even if evidence concerning the juvenile adjudication was properly admitted, certain comments made by the prosecutor in his closing argument concerning the 1966 incident constituted reversible error. The first comment which defendant claims was improper was the prosecutor's statement that the victim of the 1966 robbery and sexual molestation was a "disabled veteran." Defendant, citing *People v. Ramirez*

(1983), 98 Ill. 2d 439, argues that calling attention to the victim's status as a veteran constituted reversible error.

In *Ramirez*, 98 Ill. 2d at 457, this court held that the prosecution's closing argument was improper because it "made the jurors think that the deceased's status as a police officer was a factor to be taken into account in their deciding whether to impose the death penalty." In the instant case, however, the prosecutor's single reference to the fact that the victim of the 1966 incident was a "disabled veteran" certainly would not have "made the jurors think that the [victim's] status *** was a factor to be taken into account in their deciding whether to impose the death penalty." We therefore conclude that it did not constitute reversible error.

The second comment which defendant complains of was the statement that "[a]s you can see in aggravation and mitigation, either side can call witnesses. So do not hold that against the State because perhaps [the victim of the 1966 incident] was not here or anyone else." Defendant argues that this statement improperly shifted the burden of presenting witnesses to defendant. We decline to vacate defendant's sentence on this basis, however, because we find that the prosecutor's comments were invited by defense counsel's statement during his closing argument that "[o]f course, we're at a disadvantage on that [the 1966] case because [the victim] was not here to tell you what happened. [The victim] is not here to answer any questions that I might have of him to find out what happened that day." (See *People v. Mahaffey* (1989), 128 Ill. 2d 388, 425; *People v. Holman* (1984), 103 Ill. 2d 133, 151-52.) Furthermore, defendant waived his argument by failing to object at trial to the prosecutor's statement. *People v. Coleman* (1989), 129 Ill. 2d 321, 347; *People v. Phillips* (1989), 127 Ill. 2d 499, 526.

Defendant next claims that the sentencing court erred in ruling that certain testimony regarding defend-

ant's religious practices would be irrelevant and inadmissible. At the second stage of the sentencing hearing, defendant's sister testified in mitigation. She testified that she kept in close contact with defendant and that in the four years since his conviction in this case, defendant had changed from a person with an "I don't care about anything attitude" to a person who "cares for his family and everybody else." At one point in her direct examination, defense counsel asked her: "What is your religious background?" The prosecutor objected and the sentencing court, finding that the question had no relevance, sustained the objection. Defense counsel then asked defendant's sister: "Do you know if [defendant] practices any religion?" Once again, the sentencing court concluded that the question was not relevant and sustained the State's objection to the question.

Defendant, citing *Lockett v. Ohio* (1978), 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954, and *Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869, argues that the sentencing court's ruling constituted reversible error because it deprived him of his constitutional right to present mitigating evidence. We disagree, however, because we find that even if the court's ruling was erroneous, it was harmless error. Our conclusion is based upon the fact that defendant's sister had no personal knowledge of defendant's religious practices in prison. Instead, she could only have testified as to what defendant told her about his religious practices. This information, however, was presented to the jury through a stipulation at the hearing that a prison counselor, if called to testify, would have informed the jury that defendant attends religious services. Since defendant's sister's testimony would have been purely cumulative, its exclusion was harmless. *People v. Bartall* (1983), 98 Ill. 2d 294, 320.

Defendant's next contention is that the sentencing judge erred in allowing the State to present certain hearsay testimony at the second stage of the hearing. At issue is the testimony of a Gary, Indiana, police officer who described statements made to him by Anna Mae Williams, the purported girlfriend of defendant. The officer testified that he was told by Williams that she had been with defendant until 11 p.m. on February 21, 1980. She told the officer that she next saw defendant at 8 a.m. the next morning. (The crimes in this case took place sometime between these two times.) The officer further testified that Williams told him that she owned a .25-caliber pistol, which she discovered was missing from her home when she woke up the morning of February 22. Williams also told the officer that on February 21 defendant had told her that he needed $1,200 to buy a car. (The surviving victim in this case had earlier testified that defendant, upon breaking into her home, had stated that "this was a robbery" and that he needed $1,200.) Finally, the officer testified that Williams told him that she discovered on February 22 that she was missing some diet pills. (These diet pills were subsequently found in a jacket which defendant had worn to and left at the scene of one of the crimes in this case.)

Initially we note the well-established rule that hearsay evidence is admissible in death sentencing hearings so long as it is relevant and reliable. (See *People v. Young* (1989), 128 Ill. 2d 1, 54.) Defendant does not contend, and we do not find, that the officer's testimony in this case was unreliable. Defendant argues, however, that the officer's testimony was improper because its only purpose was to emphasize to the jury the certainty of defendant's guilt, an issue which defendant claims was not relevant in the aggravation-mitigation stage of this sentencing hearing. The State, on the other hand, argues that the officer's testimony was relevant to im-

peach defendant's testimony and to corroborate the victim's testimony. We agree with the State.

This court, in its opinion in defendant's initial appeal, stated that "any reasonable doubts the jury may have had as to whether Holman was the triggerman could have been considered in mitigation." (*People v. Holman* (1984), 103 Ill. 2d 133, 176.) As a result, defendant, at the second stage of the hearing on remand, denied firing the shots which killed the victim in this case and denied that he asked the surviving victim for $1,200. The officer's testimony, which indicated that defendant had a .25-caliber gun (the type of gun which was used to kill the murder victim) and was seeking $1,200 the night before the crimes were committed, served to rebut defendant's testimony and was therefore relevant as impeachment. Accordingly, the testimony's admission was not erroneous.

Defendant next claims that he was denied effective assistance of counsel in violation of the sixth amendment to the United States Constitution (U.S. Const., amend. VI). Defendant sets forth 10 instances in which he argues his attorney's performance was ineffective.

To prevail on a claim of ineffective assistance of counsel, a defendant must show both that his counsel's performance "fell below an objective standard of reasonableness" (*Strickland v. Washington* (1984), 466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064) and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068). Applying this standard, we conclude that defendant was not denied effective assistance of counsel.

Defendant first argues that his counsel's failure to challenge a venireperson for cause constituted ineffective assistance of counsel. The venireperson at issue indi-

cated that he had a pending lawsuit in the circuit court of Will County, the same circuit court in which the trial and resentencing hearing in this case were conducted. As a result of his pending lawsuit, defendant argues that his attorney could have successfully challenged the venireperson for cause. (See Ill. Rev. Stat. 1987, ch. 78, par. 14.) Defendant's attorney, however, chose instead to exercise a peremptory challenge on the venireperson. Counsel's decision to remove the venireperson peremptorily rather than for cause, defendant argues, was prejudicial because defendant exhausted his allotted peremptory challenges and so was later unable to challenge other venirepersons, thereby depriving defendant of his right to an impartial jury.

It is of course true, as defendant asserts, that a defendant has a fundamental right to trial by an impartial jury. (See *People v. Cole* (1973), 54 Ill. 2d 401, 411.) However, it is the defendant's burden to show that one of his jurors was not impartial. (*Cole*, 54 Ill. 2d at 413.) Here, defendant has failed to allege, much less demonstrate, that any juror who served on his jury was biased. We therefore cannot conclude that there is a reasonable probability that the result of the resentencing hearing would have been different had counsel not wasted one of his peremptory challenges.

Defendant next argues that his counsel misstated the law when counsel told the jury at the start of the second stage of the hearing, "Now this is my burden. I have to provide you with mitigation, and that's what we hope to do during this case." We find, however, that counsel's statement was not erroneous. Instead, it is consistent with this court's decision in *People v. Olinger* (1986), 112 Ill. 2d 324, 351, wherein this court made clear that "once the State establishe[s] the existence of statutory aggravating factors defendant ha[s] the burden of com-

ing forward with evidence of mitigating factors sufficient to preclude imposition of the death penalty."

The third instance of ineffective assistance of counsel, according to defendant, was counsel's failure to correct certain testimony from defendant's sister regarding the date of defendant's father's death. At the second stage of the hearing, defendant's sister testified that she and defendant had different fathers. She then testified that she believed defendant's father had died in 1979. In fact, defendant's father did not die until sometime after the crimes in this case were committed in February 1980. The date of defendant's father's death was important because defendant testified that he had spent the evening before the crimes in this case occurred looking for his father. When defendant found his father, his father told him that Anthony Townsend (the murder victim in this case) and he had had an argument that day. According to defendant's testimony, it was because of the disagreement between Townsend and defendant's father that defendant went to the Townsend home the next day.

During its deliberations after the second stage of the hearing, the jury sent a note to the judge specifically inquiring into the testimony of a number of witnesses. One of the questions they asked was when did defendant's sister say that defendant's father died? The sentencing judge, after consulting with the attorneys for both parties, sent a message to the jury that defendant and his sister "did not have the same father" and that her testimony was that "I believe [he died] in 1979."

Defendant claims that his sister's mistaken testimony made defendant's testimony as to what took place on the eve of the crimes incredible since the jury would have believed that his father was not alive in 1980. We do not agree. The jury was informed that defendant and his sister did not have the same father. The jury was also informed that the witness' testimony was that she *believed*

that defendant's father died in 1979. In light of the fact that the State itself never claimed that defendant's father was not alive in February 1980, as well as the testimony of defendant and a third mitigating witness that defendant's father was alive in 1980, we find it highly unlikely that the jury would have believed the witness' unconfirmed "belief" that defendant's father had died in 1979. We therefore do not find that there is a reasonable probability that the result of the hearing would have been different had counsel corrected the witness' belief. Accordingly, counsel's failure to correct the witness did not constitute ineffective assistance.

A fourth instance in which defendant alleges that counsel's assistance was insufficient was counsel's failure to object to the introduction of evidence and argument relating to the 1966 juvenile delinquency adjudication. We reject this claim because, as we have already explained, the introduction of and argument concerning this evidence did not constitute reversible error. Accordingly, there is little probability that the result of the hearing would have been different had counsel objected.

Defendant finally claims ineffective assistance of counsel based upon six of counsel's strategic decisions. Generally, questionable trial tactics "which arise[] from a matter of defense strategy will not *** support a claim of ineffective representation." (*People v. Madej* (1985), 106 Ill. 2d 201, 214.) One exception to this rule is where counsel has made a strategic decision to concede defendant's guilt which has "deprived defendant of the right of having the issue of his guilt or innocence presented to the jury as an adversarial issue." (*People v. Hattery* (1985), 109 Ill. 2d 449, 464.) In such instances, this court need not apply the two-part *Strickland* test in assessing the effectiveness of counsel. *People v. Johnson* (1989), 128 Ill. 2d 253, 266.

The first strategic decision complained of by defendant is counsel's conceding in the first stage of the sentencing hearing that defendant had been convicted of felony murder in this case, but arguing in the second stage of the hearing that defendant was not the one who killed the victim. Defendant argues that counsel's argument that defendant was not the one who killed the victim in this case should have been presented at the first stage of the hearing because at that stage it was still the State's burden to prove the presence of the statutory aggravating factor that "the murdered individual was actually killed [in the course of another felony] by the defendant" (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(b)(6)(a)(i)).

Defendant argues that counsel's concession in this case is equivalent to the counsel's concession of guilt that this court held constituted ineffective assistance of counsel in *Hattery*, 109 Ill. 2d at 464-65. In *Hattery*, counsel's concession of guilt, which was made during the opening arguments at defendant's trial, was unequivocal and was made despite his client's plea of not guilty. (*Hattery*, 109 Ill. 2d at 458-59.) During the trial in *Hattery*, counsel did not advance any theory of defense, offer any evidence, make any closing argument on defendant's behalf, or hold the State to its burden of proof. (*Hattery*, 109 Ill. 2d at 459.) Such a strategy, this court held, constituted ineffective assistance of counsel because it "deprived defendant of the right of having the issue of his guilt or innocence presented to the jury as an adversarial issue." *Hattery*, 109 Ill. 2d at 464.

The facts in the instant case are clearly distinguishable from those in *Hattery*. Unlike *Hattery*, the alleged concession of guilt in this case occurred at the sentencing hearing, not the trial. Thus, unlike *Hattery*, the question of defendant's guilt or innocence in this case had previously been "presented to the jury as an adversarial issue." Furthermore, counsel's statements in the

present case were not an "unequivocal" concession of guilt. (See *People v. Emerson* (1987), 122 Ill. 2d 411, 430.) Instead, counsel merely conceded the undisputed fact that defendant had already been convicted in this case of felony murder. The distinguishing characteristics of this case, as well as our recognition of the need to construe *Hattery* narrowly (see *Johnson*, 128 Ill. 2d at 269), lead us to conclude that counsel's alleged concession of guilt did not constitute ineffective assistance under *Hattery*.

We similarly find that counsel's strategic decision to forgo raising the question of defendant's responsibility for the killing until the second stage of the hearing did not constitute ineffective assistance under the two-part *Strickland* test. The sole issue at the first stage of the sentencing hearing is whether the defendant is eligible for the death penalty. The State, which has the burden of proof at the first stage, must prove beyond a reasonable doubt (1) that the defendant is at least 18 years old, and (2) the presence of a statutory aggravating factor. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(b), (f).) If the State cannot prove the existence of a statutory aggravating factor, the defendant cannot be sentenced to death. Ill. Rev. Stat. 1987, ch. 38, par. 9—1(g).

The only statutory aggravating factor in the present case is that defendant murdered someone in the course of a felony. (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6).) The State thus was required at the first stage of the hearing to prove beyond a reasonable doubt that defendant was the person who killed the murder victim in this case. Due to this burden of proving beyond a reasonable doubt, the State would have attempted to thoroughly discredit any testimony from defendant that he was not the one who killed the victim in this case. In light of the fact that defendant had already been convicted of felony murder in this case (a conviction which this court upheld

in defendant's initial appeal (*People v. Holman* (1984), 103 Ill. 2d 133, 179)), we find that the State would likely have been successful in removing any doubts from the jurors' minds that could have been raised by defendant's testimony as to defendant's responsibility for the murder.

At the second stage of the proceeding, however, neither party has the burden of proof. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446.) Instead, the State has the burden of initially going forward with evidence that the death penalty should be imposed (*Del Vecchio*, 105 Ill. 2d at 446; *People v. Ramirez* (1983), 98 Ill. 2d 439, 468-69), and the defendant has the burden of presenting evidence of mitigating factors (*People v. Olinger* (1986), 112 Ill. 2d 324, 351). The jury then engages in a balancing process in which it weighs the aggravating factors against the mitigating factors to determine whether sufficient mitigating factors exist that would preclude imposition of the death penalty. (*People v. Brownell* (1980), 79 Ill. 2d 508, 534.) Due to the absence of a burden of proof, the State was not required, as it would have been at the first stage of the hearing, to disprove defendant's contention that he did not kill the murder victim in this case. As a result, the State conceivably would have contested defendant's testimony less vigorously at the second stage of the hearing than the first. Consequently, counsel could have decided that he had a better chance of raising doubts in the jurors' minds as to defendant's responsibility for the murder by waiting until the second stage to present as a mitigating factor the argument that defendant was not the one who killed the victim. We conclude that such a decision does not constitute ineffective assistance under *Strickland*.

Defendant next contends that counsel was ineffective in failing to object to or inquire about certain testimony presented by Antoinette Townsend, the mother of the

murder victim in this case. Townsend testified that defendant forced her to drive him to Indiana after he had killed her son. When they arrived in Indiana, according to Townsend's testimony, defendant "sexually molested" her in the back seat of the car. Townsend then testified that it was from the location where defendant sexually molested her that she eventually ran from the car. As she was running, defendant shot her four times.

Defendant claims that he did not sexually molest Townsend and that counsel should have objected to her testimony or cross-examined her on this point. Counsel's failure to do so, according to defendant, constituted ineffective assistance of counsel. Our review of the record, however, indicates that counsel did ask Townsend if either she or defendant disrobed while she was in the back seat of the car, to which she replied "no." Furthermore, counsel had defendant testify after Townsend that he did not molest her. Counsel's impeachment of Townsend's claim through cross-examination and defendant's rebuttal testimony, while brief, was certainly reasonable under the circumstances here. The sexual molestation allegedly lasted for two or three minutes and allegedly occurred while both Townsend and defendant were fully clothed.

As a result, it was a minor incident in this case when compared to the murder and attempted murder which also took place. Extensive cross-examination concerning, or objections to, the testimony could have called undue attention to the incident. It could also have turned the jury's sympathy against defendant if it appeared that counsel was picking on Townsend, a woman who had been shot, and whose son had been killed, by defendant.

Defendant next contends that counsel was ineffective because he asked Townsend whether she thought that defendant should receive the death penalty. Townsend replied "yes." Even if we assume that counsel's strategy was unreasonable, defendant's claim must still fail under

the second prong of the *Strickland* test because it has not been demonstrated that there is a reasonable probability the result of the hearing would have been different had counsel not asked the question.

The next strategic decision complained of by defendant is that counsel failed to rehabilitate certain testimony that was given by one of defendant's mitigating witnesses, Eddie Sims. Sims testified that he spent the evening of February 22, 1980 (our review of the record indicates that Sims must have been testifying to events that took place on February 21, 1980, not February 22), with defendant and two other persons. At some time after midnight, according to Sims' testimony, defendant left with the two other persons. (The crimes in this case took place sometime between midnight and 8 a.m. on February 22.) Sims testified that he did not see defendant again until 1981.

On cross-examination, the State asked Sims if he ever "informed the police of this story you're telling today?" Sims answered "no." The State then asked Sims if he had testified at defendant's trial and Sims again answered "no."

Defendant believes that the State's questioning misled the jury to infer that Sims' testimony was a recent fabrication. Such an inference was prejudicial according to defendant because Sims' testimony was the only evidence which corroborated defendant's assertion that two other persons participated in the crimes that occurred in this case. To dispel this notion, defendant claims that counsel should have rehabilitated Sims by introducing evidence that Sims had offered substantially the same testimony at defendant's initial sentencing hearing in 1981. Defendant argues that counsel's failure to do so constituted ineffective assistance of counsel. We disagree.

Introduction of the testimony from the previous sentencing hearing could have resulted in the jury's finding

out that defendant had previously been sentenced to death, information which the jury otherwise would not have known. Even if, as defendant suggests, the prior testimony could have been introduced without explicit reference to the fact that there had been a prior sentencing hearing, counsel may justifiably have feared what the jury, in speculating about the source of the prior testimony, might infer. We also note that Sims' testimony was not critical to defendant's claim that he did not kill the victim in this case because Sims did not and could not testify as to what took place after defendant had left Sims for the night. Furthermore, counsel may have concluded that the inference of recent fabrication was lost on the jury since the State did not dwell on or make explicit any allegations of recent fabrication. After weighing the importance of Sims' testimony and the perhaps negligible effect of the State's cross-examination against the potential harm that could have occurred if Sims' prior testimony had been introduced, we find that counsel's decision does not constitute error under the *Strickland* test.

Defendant next claims that for no discernible purpose, counsel raised a number of prejudicial points about defendant's background and lifestyle. In particular, counsel asked defendant's sister when it was that defendant "first start[ed] getting into trouble." Counsel also asked defendant about defendant's association with gamblers and drinkers. According to defendant, these questions merely served to point out to the jury that defendant was a bad person from the age of 12. Defendant's claim, however, is without merit.

One of counsel's strategies throughout the sentencing hearing apparently was to portray defendant as a person with a drug and alcohol problem who could not avoid associating with criminals and who was unable to stay out of trouble when he was not in prison. However, while in

prison, according to counsel's argument, defendant does stay out of trouble. Counsel, in his closing argument, explained that the reason for this was that "he stays off of booze in prison, he stays off of drugs in prison, and he stays away from other persons who have criminal records like himself who tend to get into trouble again." Counsel later stated:

"The punishment [defendant] will suffer [if sentenced to life imprisonment] will be a severe punishment. Again, we are talking about prison life. Actually the only life where Mr. Holman seems to be able to conform his social activities to a structure which he is not violating a law on a continual basis.

He could spend years in prison without having any problem. But unfortunately when he's on the street that's not the case."

Counsel thus attempted to convince the jury that life imprisonment would be more appropriate in this case than the death penalty. Each of the instances cited by defendant, when viewed in their proper context, fits into this strategy. We conclude that counsel's strategy was not unreasonable under *Strickland*.

Defendant's final claim of ineffective assistance of counsel is that counsel failed to contact Anna Mae Williams, the purported girlfriend of defendant, as a possible witness for the defense. As discussed earlier, certain statements made by Williams to a Gary, Indiana, police officer were introduced by the State through the officer's testimony at the sentencing hearing. The statements were used to impeach defendant's testimony that he had not asked Antoinette Townsend for $1,200 and that he had not killed the murder victim in this case. Defendant claims that counsel's failure to contact Williams denied defendant any opportunity to rebut the statements that were attributed to her.

We begin our analysis of this final claim of ineffective assistance by recognizing that "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." (*Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 695, 104 S. Ct. at 2066.) Furthermore, even if we assume that counsel's decision here was unreasonable, we find defendant's claim of ineffectiveness to be without merit because defendant has failed to demonstrate a reasonable probability that the result of the sentencing hearing would have been different had counsel contacted Williams. Defendant's claim rests on speculation that perhaps Williams would have rebutted the police officer's statements. Nothing in the record, however, supports defendant's speculation. (See *People v. Ashford* (1988), 121 Ill. 2d 55, 77 (defendant's claim that counsel's decision not to call certain witnesses constituted ineffective assistance of counsel failed under second prong of *Strickland* test because defendant did not demonstrate that witnesses' testimony would have been favorable for defendant).) We therefore reject defendant's claim.

Defendant next claims that imposition of the death penalty in this case would be an excessive and unnecessary punishment. The only mitigating factors cited by defendant in support of his argument are his record of good behavior while in prison and his claim that he had been under the influence of alcohol and drugs when he committed the crimes in this case. These few mitigating factors, we conclude, do not outweigh the evidence introduced in aggravation here. In addition to the statutory aggravating factor that the murder here was committed in the course of a felony, defendant had two prior felony convictions. Furthermore, there was evidence introduced at the sentencing hearing that defendant had written a

letter while he was in prison awaiting trial in this case in which he sought to have Antoinette Townsend, the State's primary witness in the case, killed. In light of these substantial aggravating factors, we cannot conclude that death is an excessive penalty in this case.

Defendant also raises a number of issues relating to the constitutionality of the Illinois death penalty statute, each of which this court has previously rejected. The argument that the statute is unconstitutional because it vests in the prosecutor standardless discretion as to whether to impose the death penalty was rejected by this court in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 539-43. This court has also upheld the statute against claims that it is unconstitutional because: the statute fails to require the prosecution to prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude imposition of the death penalty (*People v. Stewart* (1984), 105 Ill. 2d 22, 75-76); the statute places the risk of nonpersuasion at the sentencing hearing on the defendant (*People v. Caballero* (1984), 102 Ill. 2d 23, 49); the statute does not guarantee that death is the appropriate punishment (*People v. Morgan* (1986), 112 Ill. 2d 111, 146-47); the statute fails to adequately narrow to a unique and cognizable group those persons eligible for death from others found guilty of murder (*People v. Olinger* (1986), 112 Ill. 2d 324, 352); the statute does not contain adequate safeguards to prevent arbitrary or capricious imposition of death sentences (*People v. Harris* (1989), 129 Ill. 2d 123, 165-66); the statute's granting of absolute power to the prosecutor to determine whether a death sentencing hearing should be held violates the separation of powers clause of the Illinois Constitution (Ill. Const. 1970, art. II, §1) (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-39). This court has also held that it is constitutional for the trial judge to instruct the jury that "neither sym-

pathy nor prejudice should influence you." (*People v. Spreitzer* (1988), 123 Ill. 2d 1, 41-43.) Finally, this court has rejected the claim that the statute is unconstitutional because it is being imposed in an arbitrary, capricious and racially discriminatory manner. (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 432; *People v. Stewart* (1988), 121 Ill. 2d 93, 106-09.) We decline to reconsider or reverse these previous decisions.

We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters* (C.D. Ill. 1989), 713 F. Supp. 1246. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1970), 432 F.2d 1072; see also *City of Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stansberry* (1971), 47 Ill. 2d 541.

The final issue we must address concerns the sentencing court's resolution of defendant's *Batson* claim. As stated earlier, while defendant's appeal from the resentencing hearing was pending, the United States Supreme Court handed down its decision in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. As a result of *Batson*, this court remanded the case to the sentencing court with instructions to conduct

a hearing on defendant's claim that the State unconstitutionally discriminated against blacks in its exercise of peremptory challenges at the resentencing hearing. The court was instructed to allow defendant to present evidence in support of his claim. If the court determined that defendant established a *prima facie* case of discrimination, the court was then to allow the State to provide nonracial reasons for its exercise of peremptory challenges. Following the State's explanations, the court was to make findings of fact and conclusions of law as to whether the State had rebutted defendant's *prima facie* case.

At the hearing on remand, it was established that the State used peremptory challenges on four blacks, a Hispanic and a Filipino. It was also established that four blacks served on the jury and three blacks had been excused for cause. Based upon this information, the sentencing judge made the following oral ruling:

"Parties have both agreed that there were a total of 11 members of the race which this Defendant was also a member. He's black or Negro race. And of the 11 that were part of the voir dire, three were excused for cause. That left eight eligible members of that class available for jury duty. That during the voir dire, 50 percent of those were accepted and 50 percent were challenged by the State.

The Filipino, Hispanic, and the Hispanic mentioned by counsel are—were not shown to have been members of the black race, so therefore they're not considered, even though they may be minorities in their own class, but they are not members of the black race, so they're not to be considered.

Now, it would appear that Defendant's counsel is indicating that no matter how many blacks may be challenged for cause or challenged peremptorily, which Batson involves, and not cause, that if you'll only challenge one out of the group or two out of the group and have

ten, we still have shown prima facie case. I don't think that's what Batson stands for.

Batson stands for a situation where it's apparent pretty much on its face that all blacks were excluded. Now, if [defense counsel] could show this Court that of the eight blacks that were on that jury available for jury duty that the State only took one or took two who, let's assume, had very responsible positions, highly educated, but they may lead to an inference that, well, those are not real members of the black community because they had it made and they're considered to be more a part of the white establishment. On that basis, the State took them for that reason.

When you have 50 percent accepted and 50 percent rejected, in this Court's opinion, the defense has not raised a prima facie case of discrimination of potential black jurors, and the State is not required to present any neutral reasons challenged, exercised as to the four blacks as to whom it was exercised. Therefore, the Batson hearing is now concluded."

Defendant claims that the judge should have considered the peremptory challenges that were exercised on the Hispanic and Filipino venirepersons in assessing defendant's *prima facie* case. This claim, however, is completely without merit since *Batson* only prohibits the State from exercising "peremptory challenges to remove from the venire members of the *defendant's race.*" (Emphasis added.) (*Batson,* 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) Similarly, for the reasons stated in *People v. Holland* (1987), 121 Ill. 2d 136, 158, *cert. granted* (1989), ____ U.S. ____, 103 L. Ed. 2d 579, 109 S. Ct. 1309, and *People v. Gaines* (1984), 105 Ill. 2d 79, 88-89, we reject defendant's claim that the State's use of peremptory challenges on black, Hispanic and Filipino venirepersons violated defendant's sixth amendment right to a jury which reflects a fair cross-section of the community.

Defendant's final claim is that the sentencing judge applied the wrong standard in assessing defendant's *prima facie* case of discrimination. To establish a *prima facie* case of discrimination under *Batson*, a defendant must first show that "he is a member of a cognizable racial group" and that the State has utilized "peremptory challenges to remove from the venire members of the defendant's race." The defendant may then "rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' " The defendant must then "show that these facts *and any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." (Emphasis added.) (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723, quoting *Avery v. Georgia* (1953), 345 U.S. 559, 562, 97 L. Ed. 1244, 1247-48, 73 S. Ct. 891, 892.) In deciding whether the defendant has established a *prima facie* case, "the trial court should consider *all relevant circumstances.*" (Emphasis added.) *Batson*, 476 U.S. at 96-97, 90 L. Ed. 2d at 88, 73 S. Ct. at 1723.

In light of the Supreme Court's instructions in *Batson*, this court has repeatedly emphasized that in determining whether a *prima facie* case of discrimination exists, a "court must avoid arbitrarily deciding this delicate question solely from the number of blacks peremptorily challenged." (*People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, quoting *People v. Evans* (1988), 125 Ill. 2d 50, 64; see also *People v. Young* (1989), 128 Ill. 2d 1, 19 ("[I]n determining whether a defendant has established a *prima facie* showing of purposeful discrimination in the prosecution's exercise of peremptory challenges, a court should consider more than simply the number of jurors excluded").) Instead, a court must con-

sider other relevant circumstances. These circumstance may include, but are not limited to, the following:

"[A] 'pattern' of strikes against black jurors; 'the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges' *(Batson,* 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723); the disproportionate use of peremptory challenges against blacks [citations]; the level of black representation in the venire as compared to the jury [citations]; whether the excluded blacks were a heterogeneous group sharing race as their only common characteristic [citation]; the race of the defendant and victim [citations]; and the race of the witnesses [citation]." *(People v. Evans* (1988), 125 Ill. 2d 50, 63-64.)

Another factor which a judge may consider is the conduct of the prosecutor in previous cases. See *People v. Mahaffey* (1989), 128 Ill. 2d 388, 414-15.

Defendant claims that the sentencing judge in this case erred by focusing exclusively on the numbers of blacks accepted and excluded by the State in assessing defendant's *prima facie* case. We agree with defendant's claim, as it is clear from the judge's oral ruling that the judge failed to consider factors other than the numbers of blacks accepted and excluded in ruling on defendant's *prima facie* case.

Having found that the sentencing judge applied the wrong standard in evaluating defendant's *prima facie* case, we must now determine whether the case should be remanded to the circuit court for a new *Batson* hearing, or whether this court itself can make the determination as to whether defendant has established a *prima facie* case. In *People v. Hooper* (1987), 118 Ill. 2d 244, this court refused to decide whether defendant had established a *prima facie* case of discrimination, choosing instead to issue a supervisory order remanding the case to the trial court to make the *prima facie* determination. Supervisory orders identical to the one in *Hooper* were

issued in this and many other cases where *Batson* claims had been raised.

The trials in *Hooper* and the other cases which this court has remanded to the circuit court all took place before *Batson* had been decided. Thus, at those trials, "the issue of the misuse of peremptory challenges to exclude blacks was considered under the law as announced in *Swain v. Alabama* (1965), 380 U.S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824. *** [However,] [t]he focus and the burden of the defendant's proof and the elements to be proved are different [under *Batson*] than they were under *Swain*." (*Hooper*, 118 Ill. 2d at 245 (Ryan, J., specially concurring).) As a result, this court would have to have assessed defendant's *prima facie* case under the standards set forth in *Batson*, but based upon a record developed under *Swain*. Such a result would have denied the defendant his right to present evidence in support of his *Batson* claim. (*Hooper*, 118 Ill. 2d at 245-46 (Ryan, J., specially concurring).) Remanding to the circuit court avoids this problem because it allows "[c]ourts of review *** the opportunity to determine the correctness of the trial court's holdings from a record made under *Batson* guidelines." *Hooper*, 118 Ill. 2d at 252 (Ryan, J., specially concurring).

The situation in the appeal currently before us is different than that which existed in the cases which required that this court remand to the circuit court. Unlike those cases, defendant has had the opportunity to substantiate his claim and this court has a record before it that was developed in accordance with the guidelines set forth in *Batson*.

We further note that the issue before us is different than the one this court addressed in *People v. Harris* (1989), 129 Ill. 2d 123, 186-87, wherein this court remanded to the trial court for a new determination as to whether the State sufficiently rebutted defendant's

*prima facie* case of discrimination. In *Harris,* this court remanded because the question of whether the State has rebutted a defendant's *prima facie* case of discrimination " 'largely will turn on evaluation of [the] credibility [of the prosecutor's explanations]' *** and credibility determinations are more appropriately left to the trial court." (*Harris,* 129 Ill. 2d at 185, quoting *Batson,* 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.) Thus, in *Harris* the issue before the court was whether the prosecutor's explanations could be believed. Whether a defendant has established a *prima facie* case, however, depends not upon any credibility determination. Instead, the question of whether a *prima facie* case exists depends upon a weighing of all of the "relevant circumstances" of the case. (*Batson,* 476 U.S. at 96, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) In this case, since the circumstances of the case appear in the record before us and are not in dispute, we can decide without remanding whether a *prima facie* case of discrimination exists.

Defendant claims that three factors support his *prima facie* case. Defendant first argues that the four excluded blacks are heterogeneous, sharing race as their only common characteristic, and that the only characteristic which distinguishes the excluded blacks from the eight whites who served on the jury is their race. The second factor cited by defendant in support of his *prima facie* case is that the prosecutor asked one of the excluded blacks if he would be sympathetic toward defendant because defendant is black. The prosecutor did not, however, ask any of the white jurors if they would or would not be sympathetic toward defendant because of his race. The final factor which defendant argues supports his *prima facie* case is that three of the excluded blacks indicated during *voir dire* that they would have been partial toward the State.

Before discussing the relevant circumstances cited by the State, we note that we find little merit to defendant's claim that the excluded blacks were heterogeneous and could only be distinguished from the whites who served on the jury by the fact that they were black. Our review of the record indicates that seven of the eight white jurors were married and the eighth was a widow. Of the excluded blacks, one was divorced, one was an unmarried single mother, and one was separated from her husband. Thus, three of the four blacks could be distinguished from the white jurors based upon their marital status.

We also attach little weight to the fact that the State asked an excluded black if he would be sympathetic toward defendant because of his race. The record shows that the question was asked after the venireperson had indicated that he had taken some classes in college in which capital punishment had been discussed. The venireperson also stated that he had listened to radio programs that had explored issues pertaining to capital punishment and that he was aware of studies that indicate that there has been a disproportionate use of the death penalty on minority groups. Because of the venireperson's familiarity with the studies, we do not believe that the prosecutor's question supports an inference of discrimination.

In contrast to the negligible value of the relevant circumstances cited by defendant, the State cites circumstances which strongly militate against the existence of a *prima facie* case of discrimination. The first factor is that the percentage of blacks in the venire was roughly 20% (11 of 59) while the percentage of blacks impaneled as jury members was over 33% (4 of 12). Furthermore, the State excused more than twice as many whites (10) as it did blacks (four). While these numbers alone are not dispositive of the issue, such numbers are certainly an

important circumstance which serves to undercut defendant's claim of discrimination. (See *Evans*, 125 Ill. 2d at 65.) The second factor cited by the State is that the racial issues involved in the jury selection were minimized by the fact that the victims in this case, like defendant, were black. (See *Evans*, 125 Ill. 2d at 65-66.) These factors, when weighed against those set forth by defendant, lead us to conclude that though the trial judge applied the wrong standard, the trial judge was correct in concluding that defendant failed to establish a *prima facie* case of discrimination.

For the reasons stated above, we affirm the judgment of the circuit court of Will County. The clerk of this court is directed to enter an order setting Tuesday, March 13, 1990, as the date on which the sentence of death entered by the circuit court of Will County shall be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 119—5). A certified copy of this order shall be transmitted by the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*