(No. 75198.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TAFFORD HOLMAN, Appellant.

*Opinion filed January 26, 1995.—Rehearing denied April 3, 1995.*

Joseph C. Polito, of Joliet, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Terence M. Madsen and Steven J. Zick, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

In this appeal from the trial court's denial of the defendant's request for post-conviction relief, the defen-

dant presents four arguments for our disposition. Initially, defendant claims that the attorney who represented him at his death penalty sentencing hearing was incompetent because he failed to present certain mitigation evidence in defendant's behalf. Second, defendant contends that his sentencing attorney labored under a conflict of interest that caused him to render ineffective representation, because the attorney allegedly told another lawyer that defendant "deserved" the death penalty. Defendant further asserts that the State improperly used two peremptory challenges to exclude a Hispanic and a Filipino juror from service at defendant's sentencing hearing. Finally, the defendant argues that the death penalty is unconstitutional, in light of certain studies with respect to jurors' ability to understand and follow instructions regarding the death penalty. We affirm the trial court's denial of the defendant's request for post-conviction relief.

I

Following a jury trial in the circuit court of Will County, defendant was convicted of murder, armed violence and home invasion. These convictions were based on charges that in 1979, defendant entered the Joliet, Illinois, home of Antoinette Townsend and killed her son, Anthony. According to evidence presented at defendant's trial, after defendant had shot and killed Anthony, defendant abducted Antoinette and drove her, in her son's automobile, to Gary, Indiana. When Antoinette attempted to escape, defendant shot her twice. He then left her at the scene and fled, believing she was dead. Following a sentencing hearing, it was determined that defendant should receive the death penalty as punishment for his murder conviction. See *People v. Holman* (1984), 103 Ill. 2d 133 (hereinafter *Holman I*).

Upon review, this court upheld defendant's convictions. (*Holman I*, 103 Ill. 2d at 158.) However, the

defendant's death sentence was reversed and the cause remanded for a new sentencing hearing, because this court determined that numerous inflammatory remarks made by the prosecution during closing argument deprived the defendant of a fair sentencing hearing. (*Holman I*, 103 Ill. 2d at 161-78.) The United States Supreme Court denied *certiorari*. *Holman v. Illinois* (1985), 469 U.S. 1220, 84 L. Ed. 2d 347, 105 S. Ct. 1204.

Following a new sentencing hearing, the defendant was again sentenced to death. Upon direct review, defendant's death sentence was affirmed. (*People v. Holman* (1989), 132 Ill. 2d 128 (hereinafter *Holman II*).) This court specifically rejected defendant's argument that his attorney at the resentencing hearing was ineffective. (*Holman II*, 132 Ill. 2d at 156-67.) In addition, the court found no error in the trial court's determination that the prosecution's exercise of peremptory challenges at the resentencing hearing had not violated the directives of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. (*Holman II*, 132 Ill. 2d at 169-77.) The United States Supreme Court denied *certiorari*. *Holman v. Illinois* (1990), 497 U.S. 1032, 111 L. Ed. 2d 804, 110 S. Ct. 3296.

Defendant then filed a petition for post-conviction relief. (725 ILCS 5/122—1 *et seq.* (West 1992).) The trial court denied the relief requested by defendant in his petition. Upon review, defendant presents only four of the arguments he raised in his post-conviction petition. These arguments are: (1) his counsel at the resentencing hearing was incompetent because he failed to present certain mitigation evidence in defendant's behalf; (2) his attorney at the resentencing hearing was ineffective because he allegedly told another attorney that defendant "deserved" the death penalty; (3) the State improperly used two peremptory challenges to exclude a Hispanic and a Filipino juror; and (4) the death

penalty is unconstitutional, as shown in certain studies regarding a jury's ability to understand and follow instructions regarding the death penalty. We consider each of these arguments *seriatim*.

## II

Defendant argues that his attorney at the resentencing hearing, Paul Bjekich, was incompetent because he failed to investigate additional mitigation evidence that should have been presented on defendant's behalf.

Before considering the merits of the defendant's claim, we address the State's argument that this issue is waived. Where a defendant's allegation of ineffective assistance of counsel relies upon matters that were not and could not be included in the record of defendant's direct appeal, and does not merely reiterate an argument raised on direct appeal, the defendant's claim is not waived for the purpose of post-conviction review. (See, *e.g, People v. Erickson* (1994), 161 Ill. 2d 82; *People v. Owens* (1989), 129 Ill. 2d 303.) Defendant's ineffective assistance argument relies upon mitigation evidence that was not part of the record in his direct appeal. Also, defendant's ineffective assistance claim does not restate arguments made in his direct appeal, inasmuch as the defendant's direct appeal challenged only those matters that appeared of record from his resentencing hearing. As a result, defendant's argument is properly raised in his post-conviction proceeding.

The trial court held an evidentiary hearing with respect to defendant's allegations that his counsel was ineffective for failing to investigate and present additional mitigation evidence. The record of the hearing reveals the following pertinent evidence.

Paul Bjekich testified at the court's hearing on defendant's post-conviction allegation of ineffective assistance of counsel. He testified that he had previous experience representing defendants in capital cases. With

respect to the evidence he offered in defendant's behalf at the defendant's resentencing hearing, attorney Bjekich recalled that Fred Morelli testified in mitigation. Morelli had represented defendant in a case in another county. Morelli testified that defendant had been cooperative and truthful, that defendant was not "a leader type, and that he was a follower." Attorney Bjekich considered Morelli a mitigation witness.

Attorney Bjekich also recalled that one of defendant's sisters testified at the resentencing hearing, reciting defendant's family background and the family's contact with him since he had been in prison. The record also shows that at defendant's resentencing hearing, defendant testified in his own behalf and stated that he had not shot or killed Anthony Townsend. The record further indicates that attorney Bjekich called Eddie Sims, whose testimony he offered in order to corroborate the defendant's testimony regarding his physical and emotional condition on the day of the incident. Stipulated testimony was also presented in defendant's behalf, to show that a prison counselor, if called to testify, would state that defendant attended religious services. *Holman II*, 132 Ill. 2d at 154.

With respect to his investigation of the case prior to the resentencing hearing, attorney Bjekich testified that defendant was not very cooperative in developing his defense when they first met. However, defendant later changed and became more cooperative. Attorney Bjekich related that he discussed with the defendant, at length, potential mitigation evidence or witnesses to call at the hearing. The attorney testified that he interviewed everyone whom defendant requested or suggested for personal background information. With respect to potential witnesses who did not testify at the resentencing hearing, attorney Bjekich stated that he spoke to these persons, but concluded that they should

not be called because their testimony would not be helpful to the defendant's defense. He did not call one of the defendant's sisters because she was pregnant and it would have been too difficult for her to testify at the hearing. Instead, one of the defendant's other sisters testified at the resentencing hearing.

Attorney Bjekich stated that he never used the services of an investigator and never asked the court to appoint one to help him find mitigation evidence. He explained that "after interviewing [the defendant], getting a background on him through his words, talking to family members, there didn't seem to be any area that needed that type of investigation." Attorney Bjekich stated that defendant was going to take the stand and he was going to testify as to what happened that night and that this was "an important part of the evidence that was presented." He explained that the "theory *** was that [defendant] hoped to convince at least one person that he didn't do the murder" and that someone else had actually killed Anthony Townsend.

Attorney Bjekich further explained that in this case, "it didn't look like it was a compelling argument to talk about defendant's upbringing as a three, four, five, or six year old." Attorney Bjekich found no mental deficiency in the defendant "whatsoever" when he talked to the defendant. Attorney Bjekich said that he had considered contacting a psychologist, psychiatrist, or social worker, but that there were no indications that this would produce useful evidence for the resentencing hearing. Attorney Bjekich also didn't believe that such evidence "goes over that well in Will County [where defendant was tried]" and that the evidence is "somewhat obscure."

Attorney Bjekich testified that, to the best of his knowledge, Capital Resources Center of the State Appellate Defender's office did not have a mitigation special-

ist expert in 1985. Attorney Bjekich stated that he discussed defendant's case with an assistant Cook County public defender with whom he was acquainted. This attorney was employed on the "death squad" and attorney Bjekich "would talk to him to see what he felt were appropriate tactics."

Defendant submitted affidavits and reports to show that there was substantial mitigation evidence that attorney Bjekich would have discovered had he undertaken adequate investigation into the defendant's background. For example, Chandra J. Walker Smith, a mitigation specialist for the Capital Resources Center, stated that defendant's family history showed that he had been beaten and abused by his father, who was an alcoholic and a "very violent man." From the time that defendant was a small child, defendant's father attempted to teach defendant how to gamble, drink, and fight. Defendant's mother divorced his father and later remarried. The defendant's stepfather also beat and mistreated the defendant. Defendant left home at the age of 13 and went to live with other family members and friends.

Smith recounted that she had interviewed defendant's sisters as well as certain friends of the defendant. Defendant's sisters stated that they had a good relationship with him, that he always tried to help and protect them, and that he was usually more concerned about the welfare of others than he was about his own. Other family members, and friends, echoed these sentiments. Their affidavits, in support of defendant's post-conviction petition, detailed their appreciation for defendant's actions in their behalf.

Smith also reviewed defendant's prison records. These records indicated that defendant had a history of numerous incarcerations. In an initial assessment when he was 16 years old, defendant was described as a

"small, angry, rejected youth that displaced his anger at being rejected and abandoned upon the society in an antisocial manner." At the age of 16, defendant was found to be functioning at a 3.7 grade level. Based upon medical examinations, it was determined that there may be "some cerebral dysfunction." In general, it was believed that defendant "generally made a positive adjustment to prison life."

Smith testified that she was hired in 1990 as the first mitigation expert for the Capital Resources Center of the State Appellate Defender's office. Smith stated that she did not know whether or not there were mitigation experts in 1985 at the time defendant was resentenced and that she had never personally come into contact with a mitigation specialist who was active in the State of Illinois in 1985.

Linda Wetzel, a professionally trained psychologist with a doctorate in clinical psychology, stated in a report accompanying her affidavit that she had reviewed defendant's medical histories. Based on this information, Wetzel stated that she had "concluded that there is significant evidence that [defendant] is suffering from neuropsychological brain impairment of moderate severity." Wetzel noted that defendant had sustained at least two head injuries, and that he suffered from alcohol abuse during his adolescence. Wetzel suggested that a "full neuropsychological test battery can demonstrate the presence of organic brain impairment and delineate specific areas of cognitive dysfunction."

Thereafter, Wetzel administered various neuropsychological tests to defendant in order to perform an evaluation of the defendant. In her report, Wetzel stated that defendant had a "Low Average IQ which is consistent with an impoverished educational and cultural background." She also stated that defendant's "[l]anguage abilities and social skills are well developed and

are likely to mask and compensate for deficits such as poor reading ability, and impaired memory and learning." Wetzel reported that "[i]mpaired delayed memory, significantly reduced learning ability, bilateral motor slowing, and mildly concrete thinking indicate that [defendant] is suffering from diffuse, mild bilateral, neuropsychological impairment consistent with the long term results of a mild closed head injury."

Defendant also offered evidence to show that a competent criminal defense attorney would have investigated defendant's background in order to uncover the mitigation evidence substantiated by Smith and Wetzel. Allan Sincox, an attorney employed by the public defender's office in Cook County, testified that he had been employed for several years in that office, eventually working in the multiple defendant division on homicide cases, to which he was assigned in 1985. Sincox related that he had worked on approximately 10 to 15 death penalty mitigation hearings.

Sincox testified that it was the practice and policy of the public defender's office to always have two lawyers assigned to a capital case. There were certain investigations that were always undertaken to determine the evidence that could and should be presented in the defendant's behalf. For example, in "every case *** there was some effort to investigate mental status of the person" and a psychologist or psychiatrist would be consulted. There was also a "special group of ministers that were available *** that *** were used to help in communicating with the client and the client's family." According to Sincox, the ministers could sometimes build "a strong enough relationship *** over a long enough period of time that the minister would actually become a witness in mitigation."

Sincox testified that the public defender's office also had two investigators on staff who would help to

interview mitigating witnesses, and obtain school, military, medical, or prison records. He testified that the attorneys to whom the case was assigned would often accompany the investigators when interviewing witnesses who might testify in the defendant's behalf at the mitigation hearing.

Attorney Sincox further stated that all of this defense evidence would regularly be obtained regardless of the defense that the defendant wanted to present at his trial. Attorney Sincox stated that even where a defendant testifies that he did not commit the crimes, the defense attorney should nevertheless present all the mitigation evidence that he can find. Sincox did not believe that such a strategy would be inconsistent or internally contradictory.

The trial court rejected the defendant's argument that his resentencing attorney, Paul Bjekich, had been ineffective. The court found that "Attorney Bjekich had the cooperation of the Petitioner to develop mitigation evidence and followed up on the leads suggested by the Petitioner." The court determined that "it was a matter of strategy for Attorney Bjekich to primarily attempt to convince at least one juror that the Petitioner did not personally kill the victim in this case in order to prevent the necessary unanimous verdict at sentencing." The court concluded that attorney Bjekich's "performance did not fall to a level of incompetence in his tactical choice not to try to mitigate the crime by way of introducing more evidence regarding the defendant's background prior to his first incarceration as a juvenile."

The trial court believed that "the testimony of Attorney Allan Sincox amounts to a difference of opinion as to how Attorney Sincox would have tactically conducted the sentencing hearing had he been counsel." Similarly, the court concluded that Smith's testimony

and her investigative work "were an example of how mitigation experts analyzed a death penalty case in 1992 and 1993." The court declined to "retroactively apply procedures used in 1992 and 1993 capital cases to a sentencing hearing occurring in 1985." The court concluded that the "level of legal representation by Attorney Bjekich was more than legally adequate for a 1985 sentencing hearing."

In this appeal, defendant challenges the trial court's ruling that attorney Bjekich provided him adequate legal representation at his resentencing hearing. In order to establish ineffective assistance of counsel, the defendant must satisfy the stringent two-prong test enunciated by the United States Supreme Court in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504, 526. Under *Strickland*, a defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In addition, the defendant must show that his defense was prejudiced by counsel's defective performance. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

A defendant cannot rely on speculation or conjecture to justify his claim of incompetent representation, but must prove that the outcome of the proceeding probably would have been different if his attorney had not been ineffective. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) The reviewing court is obligated to indulge in a strong presumption that defendant's attorney was in fact competent, that counsel exercised sound professional judgment, and that the attorney's

representation fell within the broad parameters of acceptable professional assistance. (*Strickland*, 466 U.S. at 689-90, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065-66.) We are also mindful that " 'the failure to offer evidence in mitigation does not, in and of itself, demonstrate incompetence.' [Citations.]" *People v. Williams* (1991), 147 Ill. 2d 173, 257, quoting *People v. Shum* (1987), 117 Ill. 2d 317, 370; see also *People v. Hampton* (1992), 149 Ill. 2d 71, 110.

Defendant argues that his attorney was ineffective because he failed to investigate and present mitigation evidence regarding defendant's family background and mental disabilities. Defendant claims that his attorney "never recalled seeing any of the exhibits that were presented at the post-conviction hearing" including defendant's prison and medical records. Defendant asserts that if attorney Bjekich had reviewed the records, he would have found important information that would have led the attorney to retain a mental health expert to interview and test the defendant. Defendant also suggests that an investigator should have been hired to investigate his background.

The evidence presented at the hearing on defendant's ineffective assistance claim does not support his argument. Attorney Bjekich testified that he reviewed defendant's background with the defendant, considering every lead and witness suggested by the defendant. The extent to which defense counsel pursued avenues of inquiry as provided by the defendant is an important barometer of the attorney's effectiveness. (*People v. Kokoraleis* (1994), 159 Ill. 2d 325, 330.) Furthermore, attorney Bjekich testified that he could not recall whether he had looked at the defendant's medical or school records, and could not refresh his recollection because his notes had been lost. Thus, it cannot be determined from the record whether attorney Bjekich failed to review

defendant's medical and school records. However, the record does support the trial court's determination that attorney Bjekich performed an adequate investigation into those matters suggested by defendant.

It is also significant that attorney Bjekich found the defendant to be of normal intelligence and understanding, and therefore did not believe there was any justifiable basis to submit defendant to psychiatric or psychological examination. Where the circumstances known to counsel at the time of his investigation do not reveal a sound basis for further inquiry in a particular area, it is not ineffective for the attorney to forgo additional investigation. (*People v. Eddmonds* (1991), 143 Ill. 2d 501, 532.) We cannot say that attorney Bjekich was incompetent because he failed to recognize that defendant might be suffering from a mental disability, where there were no external indicia that would have prompted the attorney to suspect that the defendant was so afflicted.

We also reject the defendant's argument that his attorney should have retained an investigator to review defendant's background. Attorney Bjekich testified that he conducted the investigations himself by talking with witnesses suggested by the defendant. Attorney Sincox similarly testified that attorneys working on a case often accompanied the investigator when interviewing witnesses who might be called at the mitigation hearing. Under these circumstances, it was not necessary that defendant's attorney retain an investigator, and his failure to do so cannot be deemed ineffective representation.

With respect to the retention of a mitigation expert, we note that the record reflects that mitigation expert services may not have been readily available to defendant's attorney when he represented the defendant in Will County in 1985. Although attorney Sincox testified

that mitigation experts were available in 1985, this was disputed in the record. For example, Chandra Walker Smith, a mitigation specialist, acknowledged that she was unaware of a single mitigation expert active in Illinois in 1985. Also, defendant's attorney stated that he was not aware of mitigation experts in 1985. In addition, defense counsel testified that he could find nothing in his contacts with defendant that would indicate that defendant should be given a psychological evaluation. Given these considerations, we find no lack of competence in attorney Bjekich's failure to retain a mitigation expert in defendant's behalf for his resentencing hearing.

Defendant further emphasizes that attorney Sincox testified that attorney Bjekich's tactics were not sound trial strategy. Defendant stresses what he perceives was substantial mitigation evidence, as demonstrated in the testimony of Chandra Walker Smith and Linda Wetzel. He argues that attorney Bjekich's decision that defendant's mental condition and background were not relevant was "based upon lack of understanding and knowledge."

This court has declined adoption of a *per se* rule of ineffective assistance of counsel whenever an attorney has not offered specific mitigation evidence in the defendant's behalf, noting that mitigation evidence "can be double-edged, and trial counsel may feel that the risks in presenting potentially mitigating evidence are too high." (*People v. Steidl* (1991), 142 Ill. 2d 204, 249.) Similarly, we reject defendant's reliance on the testimony of attorney Sincox to support his claim that attorney Bjekich's strategic decision to forgo presentation of additional mitigation evidence was not sound, but was rather based on a lack of understanding of defendant's mental condition and family background.

The record does not show that attorney Bjekich

failed to appreciate defendant's background and circumstances. Of particular significance in this regard is the professional opinion held by attorney Bjekich, as reflected in his testimony at the trial court's hearing, that he believed evidence of the defendant's mental condition and family background would not have been helpful to his defense because such evidence did not "go over well" in Will County, where defendant was tried and convicted. Attorney Bjekich was also not unaware of defendant's mental condition. At defendant's resentencing hearing, attorney Bjekich pointed out that defendant suffered from drug and alcohol-related problems, which counsel portrayed as significant contributing factors to his criminal behavior. *Holman II*, 132 Ill. 2d at 165.

We note that the strategy used by attorney Bjekich at defendant's resentencing hearing was dictated, in large part, by the defendant's decision to testify at his trial that he was not the person who shot or killed Anthony Townsend. Attorney Bjekich believed it would be contradictory for the defendant to claim that he did not commit the murder, and also present mitigation evidence to explain or elucidate why he committed the murder. Defense counsel's decision to forgo the presentation of mitigation evidence that would be inconsistent with the defendant's sworn trial testimony has been held constitutionally adequate. (*People v. Kokoraleis* (1994), 159 Ill. 2d 325, 330-31.) We find this conclusion equally applicable to the present cause.

Finally, we cannot accept defendant's argument that the mitigation evidence presented at the post-conviction hearing would have persuaded the jury to a different conclusion at his resentencing hearing. Contrary to the defendant's suggestion, the jury at his resentencing hearing heard substantial mitigation evidence. The jury heard testimony that defendant was well adjusted in

prison and had recovered from his problems with drugs and alcohol, testimony that defendant attended religious services and was loved by his family members, and testimony that defendant did not actually kill the victim. The jury's rejection of the defendant's theory of defense does not dictate the conclusion that attorney Bjekich was incompetent. *People v. Lear* (1991), 143 Ill. 2d 138, 152.

This court's analysis in *Holman II* does not compel a different decision. In rejecting defendant's argument that the death penalty in his case is excessive and unnecessary, the court noted that the "only mitigating factors cited by defendant in support of his argument are his record of good behavior while in prison and his claim that he had been under the influence of alcohol and drugs when he committed the crimes in this case." (*Holman II*, 132 Ill. 2d at 167.) From this comment, defendant draws the inference that this court might have been persuaded to overturn his death penalty sentence, if there had been more mitigation evidence presented in his behalf. We disagree.

It is unlikely that the additional mitigation evidence presented by defendant at his post-conviction proceeding would have persuaded the sentencing jury or this court to reach a different disposition. The defendant's new mitigation evidence indicated that he had been abused by his father and his stepfather when he was a child. With respect to his mental condition, the evidence showed that the defendant was only slightly below average in intelligence and that his social and verbal skills were well developed. In contrast, the aggravation evidence showed that defendant had two prior felony convictions and "had written a letter while he was in prison awaiting trial in this case in which he sought to have Antoinette Townsend, the State's primary witness in the case, killed." (*Holman II*, 132 Ill. 2d at 167-68.) In

view of this aggravation evidence, it is improbable that the defendant's additional mitigation evidence would have altered the result reached at his resentencing hearing, or that this court would have overturned defendant's sentence upon review.

Defendant relies upon the decisions in *People v. Perez* (1992), 148 Ill. 2d 168, and *Brewer v. Aiken* (7th Cir. 1991), 935 F.2d 850, but each is inapposite to the present cause. In both of those cases, the evidence showed that the defendants suffered from mental disabilities considerably more severe and debilitating than the mental condition of the defendant in the present cause. *Kubat v. Thieret* (7th Cir. 1989), 867 F.2d 351, is also distinguishable, inasmuch as the defense counsel in that case failed to present any mitigation evidence whatsoever in the defendant's behalf at his sentencing hearing.

## III

Defendant also argues that the trial court should have granted him an evidentiary hearing with respect to his allegation that attorney Bjekich was ineffective because he was laboring under a conflict of interest. Defendant alleged that his counsel told another lawyer that defendant "deserved" the death penalty.

To support these allegations in his post-conviction petition, the defendant submitted the affidavit of attorney Kyle Wesendorf. Wesendorf represented defendant on direct appeal in *Holman I*, where this court granted defendant a new sentencing hearing. Wesendorf stated that after reversal and remand, she continued to be involved in defendant's case and helped defendant secure new counsel. When the court appointed attorney Bjekich to represent the defendant, Wesendorf offered to aid him in preparing for the new sentencing hearing. Wesendorf met with attorney Bjekich to discuss defendant's case. During this discussion, Wesendorf "got the

impression that [attorney Bjekich] was not enthusiastic about the case *** because *** [he] did not ask [Wesendorf] any questions about the case and he sat back in his chair in a disinterested way." Later, Wesendorf and attorney Bjekich met with the defendant. After this meeting, as Wesendorf and attorney Bjekich were returning to attorney Bjekich's office, "Attorney Bjekich made a derogatory comment about [the defendant] and then said that [defendant] deserved the death penalty and that he was the kind of person for whom the death penalty was designed."

The trial court dismissed the allegations of defendant's post-conviction petition that were based on the representations made in Wesendorf's affidavit and denied the defendant's request for an evidentiary hearing on the issue. The court found that the information contained in the affidavit "is not sufficient to show ineffective assistance of counsel."

The State argues that the defendant's claim on this point is waived. We disagree. As we noted earlier, a defendant does not waive an allegation of ineffective assistance of counsel where he relies on evidence *dehors* the record of his direct appeal. Waiver also is not implicated where the defendant's ineffective-assistance claim does not merely reword an argument he had already raised on direct appeal. In this case, defendant's ineffective-assistance argument relies upon the affidavit of Kyle Wesendorf, which was not part of the record of defendant's direct appeal. Also, defendant's ineffective-assistance claim does not merely reiterate or amplify upon the specific arguments he made in his direct appeal; none of the defendant's ineffective-assistance claims on direct appeal alleged that his attorney was suffering from a conflict of interest because he lacked confidence in the defendant's position. Consequently, the question is preserved for post-conviction review.

Defendant argues that the remarks of his counsel to Wesendorf demonstrate that defendant is entitled to an evidentiary hearing at which he can show that his attorney was laboring under an actual conflict of interest. When reviewing a trial court's dismissal of a post-conviction allegation without an evidentiary hearing, the proper question is whether the defendant's allegations, viewed in the light favorable to him, are such that he should be given an opportunity to prove his assertions. *People v. Ruiz* (1989), 132 Ill. 2d 1, 25-28; *People v. Caballero* (1989), 126 Ill. 2d 248, 259.

Defendant contends that the representations in the Wesendorf affidavit indicate that attorney Bjekich was ineffective because he had no confidence in the defendant's position and therefore could not mount a successful defense in defendant's behalf.

Defendant suggests that this court should adopt the reasoning of the Federal court of appeals in *Osborn v. Shillinger* (10th Cir. 1988), 861 F.2d 612. In that case, the court determined that a defendant was deprived of the effective assistance of counsel, under *United States v. Cronic* (1984), 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039, because the attorney's representation utterly failed to attempt any adversarial testing of the State's evidence against the accused.

However, there are critical and significant distinctions between the remarks made by defense counsel in *Osborn* and the comments allegedly made by attorney Bjekich in the present cause. The statements made by counsel in *Osborn* were public exclamations that the defendant deserved the death penalty. In contrast, attorney Bjekich's statements were made in private to another attorney. Also, counsel's remarks in *Osborn* were repeated publicly on three different occasions, including statements to the bench during and after defendant's sentencing hearing. Attorney Bjekich's comments oc-

curred on a single occasion. There is nothing in the record before us to indicate that attorney Bjekich ever made a single derogatory comment to the prosecution, the jury, or the trial court judge regarding the defendant. We in no way condone attorney Bjekich's comments, if in fact they were made. Nevertheless, it appears that the attorney's alleged statements were no more than momentary, isolated and private remarks to another lawyer who had no current association with the case and who was sympathetic to the defendant's interests.

Also, we find it significant that the representation attorney Bjekich provided to the defendant was different from and far superior to that provided by defense counsel in *Osborn*. Attorney Bjekich mounted a viable, although ultimately unsuccessful, defense for his client. As we noted earlier in this opinion, defense counsel presented significant mitigation evidence in the defendant's behalf. Attorney Bjekich also made cogent closing comments suggesting that defendant should be spared the death penalty. (See *Holman II*, 132 Ill. 2d at 165-66.) The record in the present cause does not suggest, as it did in *Osborn*, that attorney Bjekich's loyalties were torn between his duty to defend his client and his personal predilection to favor the prosecution. Rather, attorney Bjekich represented defendant both zealously and capably at the resentencing hearing. Under these circumstances, there was no error in the trial court refusal to hold an evidentiary hearing with regard to the allegations made in the Wesendorf affidavit.

IV

The defendant contends that he should receive a new sentencing hearing because the instructions given to the jury were vague and confusing. To support his argument, defendant cites *United States ex rel. Free v. Peters* (N.D. Ill. 1992), 806 F. Supp. 705, where the

district court accepted the findings of a study performed by Professor Hans Ziesel, in which the professor concluded that a jury is largely unable to understand Illinois Pattern Jury Instructions regarding the death penalty.

The Seventh Circuit Court of Appeals overruled the district court's decision in *Peters*. (See *Free v. Peters* (7th Cir. 1993), 12 F.3d 700; *Gacy v. Welborn* (7th Cir. 1993), 994 F.2d 305.) We have similarly declined to adopt the district court's view. (See, *e.g.*, *People v. Williams* (1994), 161 Ill. 2d 1, 59; *People v. Kokoraleis* (1994), 159 Ill. 2d 325, 333.) In light of our rejection of the district court's reasoning in *Free*, we find no error in the trial court's denial of defendant's request for a new sentencing hearing on this basis.

V

Defendant suggests that he should receive a new sentencing hearing because the State used peremptory challenges in violation of *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Specifically, defendant takes issue with the prosecution's challenge of two prospective jurors, Dolores Payton-Hernandez, who is Hispanic, and Vivian Marquez, who is Filipino.

The court rejected this argument in *Holman II*, reasoning that *Batson* only applies where the prospective jurors share the same race as the accused. Because the defendant is African-American, we found that he could not challenge the State's use of a peremptory challenge to exclude a prospective juror who was Hispanic or Filipino. *Holman II*, 132 Ill. 2d at 171.

After defendant's conviction was final, and while his post-conviction petition was pending, the United States Supreme Court decided the case of *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364. In *Powers*, the Court held that an accused may object to race-based exclusion of a juror even though the defendant

and the juror do not share the same race. In light of this ruling, defendant argues that the trial court should have considered the merits of his *Batson* argument with regard to prospective jurors Payton-Hernandez and Marquez.

In *Teague v. Lane* (1989), 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060, the United States Supreme Court barred the retroactive application, upon collateral review, of a new constitutional rule of criminal procedure that is announced after a defendant's conviction is final because all avenues of direct appeal have been exhausted. The defendant does not argue that either of the two narrow exceptions recognized by the *Teague* Court should apply to the case presently before us.

The Supreme Court held that a case announces a new rule "when it breaks new ground or imposes a new obligation on the States or the Federal Government." (*Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070.) In other words, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." (*Teague*, 489 U.S. at 301, 103 L. Ed. 2d at 349, 109 S. Ct. at 1070.) The Court has also explained that a new rule is announced if the decision "was susceptible to debate among reasonable minds." (*Butler v. McKellar* (1990), 494 U.S. 407, 415, 108 L. Ed. 2d 347, 356, 110 S. Ct. 1212, 1217-18.) In the words of the Supreme Court in *Graham v. Collins* (1993), 506 U.S. 461, 467, 122 L. Ed. 2d 260, 270, 113 S. Ct. 892, 898, "unless reasonable jurists hearing petitioner's claim at the time his conviction became final 'would have felt compelled by existing precedent' to rule in his favor, we are barred from doing so now. [Citation.]"

In *Allen v. Hardy* (1986), 478 U.S. 255, 92 L. Ed. 2d 199, 106 S. Ct. 2878, the Supreme Court held that *Batson* was a new rule of criminal procedure that should

not be applied retroactively to collateral challenges of an accused's conviction that had become final before *Batson* was announced. The question in the present case is whether the Court's decision in *Powers* is also barred from retroactive application to a post-conviction proceeding involving a criminal defendant's conviction that was admittedly final when *Powers* was decided.

This question has been considered and resolved by three Federal courts of appeals, all of which have held that *Powers* is not susceptible to retroactive application to a *habeas corpus* proceeding. (*Echlin v. LeCureux* (6th Cir. 1993), 995 F.2d 1344; *Holland v. McGinnis* (7th Cir. 1992), 963 F.2d 1044; *Farrell v. Davis* (11th Cir. 1993), 3 F.3d 370.) We agree with the reasoning and conclusion of these decisions. The Supreme Court's decision in *Powers* was a new rule that went beyond the Court's holding in *Batson*. While the *Batson* decision held that an accused must show that he shared the same race as the prospective juror (see *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723), the *Powers* Court overruled this requirement and held that shared race was not a prerequisite to a *Batson* challenge (*Powers*, 499 U.S. at 415-16, 113 L. Ed. 2d at 428-29, 111 S. Ct. at 1373-74). It is also noteworthy that numerous Federal courts held, before *Powers* was decided, that common race between the accused and the prospective juror was a requirement of a *Batson* challenge. (See *Holland*, 963 F.2d at 1054 (and cases cited therein).) This court had also so held, prior to the *Powers* decision. See, *e.g.*, *Holman II*, 132 Ill. 2d at 171.

In light of these considerations we find no error in the trial court's dismissal of defendant's post-conviction petition with respect to this issue. Application of *Powers* to defendant's post-conviction proceeding would have been an improper, retroactive operation of a new rule of criminal procedure in order to collaterally challenge the

defendant's conviction, which had become final before *Powers* was announced.

For the reasons stated, the judgment of the circuit court is affirmed. We direct the clerk of this court to enter an order setting Tuesday, May 16, 1995, as the date on which the sentence of death entered by the circuit court is to be carried out. The defendant shall be executed in a manner provided by law (725 ILCS 5/119—5 (West 1992)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution where the defendant is now confined.

*Affirmed.*