2023 IL App (1st) 210687-U

SECOND DIVISION
September 19, 2023

No. 1-21-0687

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | 06 CR 26759 |
| | ) | |
| DEVON FORTNER, | ) | Honorable |
| | ) | Neera Lall Walsh, |
| Petitioner-Appellant. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed in part, reversed in part, and remanded. Petitioner made substantial showing that trial counsel was ineffective for failing to investigate newspaper advertisement found on victim's body. Remaining claims of ineffectiveness failed. Petition did not demonstrate that prosecutors concealed exculpatory evidence.

¶ 2    In early October 2005, an off-duty Chicago police sergeant gathered a group of kids to clean up the neighborhood in the Greater Grand Crossing neighborhood in Chicago. One of the children came across the body of Crystal Polk in an overgrown yard. Polk had been stabbed, strangled, and sexually assaulted.

¶ 3    More than a year later, police arrested Devon Fortner, petitioner here, for her murder. At trial, the evidence showed that petitioner had been seen with Polk a few days before her body

was discovered, his DNA profile was found on her fingernails (along with DNA profiles of others as well), and a neighbor had seen scratches on petitioner's body after the murder. A jury found him guilty of first-degree murder, and this court affirmed his conviction on direct appeal.

¶ 4    Petitioner then filed a postconviction petition, which advanced to the second stage, where counsel investigated the case and obtained affidavits from several witnesses. One was from the State's star eyewitness, who recanted aspects of her trial testimony and alleged prosecutors threatened her moments before she testified.

¶ 5    In a lengthy and well-reasoned order, the circuit court dismissed the petition. Petitioner appeals, claiming his petition made a substantial showing that his constitutional rights were violated. We conclude that one claim warrants a third-stage evidentiary hearing, but we affirm the circuit court on the rest of petitioner's claims and reject any challenge to postconviction counsel's performance.

¶ 6                                    BACKGROUND

¶ 7     We draw the facts from petitioner's jury trial. On October 4, 2005, petitioner and Crystal Polk went to a liquor store at the corner of 75th Street and Cottage Grove in Chicago, then walked back to petitioner's house in the 7400 block of South Maryland Avenue. Polk was dressed in a white tank top and blue jean capri pants. Petitioner lived in a two-flat; he and his mother occupied the top unit, while petitioner's aunt, Constance Marsh, lived with her mother in the downstairs unit. At the time, petitioner's mother was out of town, but his aunt and her mother were home.

¶ 8    When petitioner and Polk got close to house, Tashia Murphy Strange saw them and came out to speak to petitioner. Strange was petitioner's cousin by marriage and was visiting her mother, who lived across the street. Strange asked to borrow a computer disk from petitioner. He

and Polk went inside his house, and shortly thereafter, petitioner came out and gave the disk to Strange. Strange left with the disk and went home that same night.

¶ 9     Four days later, Brad Redrick, an off-duty Chicago Police Sergeant, gathered a group of children in the neighborhood to clean it up. One of the children came across Polk's body in an overgrown yard near the alley behind 7414 South Drexel Avenue. Redrick said the woman was wearing a t-shirt and blue jeans, but he did not see any signs of decomposition. According to police reports, there was an advertisement for a sale at Shoe Carnival, dated October 6, 2005, in the back pocket of Polk's jeans. (Though this fact did not come out at trial, it will be important later.) Polk's body was taken to the medical examiner's office, where Dr. Mitra Kalelkar performed an autopsy.

¶ 10                    I. Tashia Strange's Varying Accounts

¶ 11    A few days after Polk's body was found, Strange called police to speak with them about petitioner. She told them that, on either October 10 or 11, she and her sister, Tiffany Murphy, were with a group of friends, all speaking with petitioner in front of his home discussing Polk's death. At first, petitioner denied he had been with Polk before she was killed, but after Strange reminded him that she saw them together (when she asked to borrow a computer disk), he admitted they had been together the night of October 4.

¶ 12    In fact, said Strange, at this time on October 10 or 11, Petitioner told Strange that he and Polk had sex the night of October 4. When Strange pointed out the police might find DNA on Polk's body, he changed his story again and said Polk only performed oral sex on him. Strange told police that, when she was speaking with petitioner, she saw scratches on his neck and back, as well as a gash on his lip. Petitioner told her that a dog had scratched him, and he got the gash in his lip from walking into a wall while drunk.

¶ 13    Police eventually arrested petitioner on October 26, 2006, more than a year after Polk's death. A few days later, Strange spoke to Assistant State's Attorney Aidan O'Connor, who took down a written statement consistent with what Strange told police the year before.

¶ 14    About a month after petitioner was arrested, however, Strange wrote him a letter in jail, telling him that she was not going to testify against him and that most of what she told police and prosecutors was just hearsay from people off the street, not things she personally knew. When she was scheduled to appear before a grand jury and testify about the case, she did not show up.

¶ 15    In January 2007, Strange then went to see petitioner's counsel. There, counsel went through her handwritten statement to ASA O'Connor, and Strange told him what was true and not true in the statement. Defense counsel then typed out Strange's statement to him in a two-page document that included the questions he asked her and her answers. In the statement to defense counsel, Strange said she did not see any scratches on petitioner's back, nor did petitioner tell her that he and Polk had sex on October 4, 2005.

¶ 16    Later, in June 2007, after the State moved to revoke petitioner's bond, Strange testified at a court hearing. At that hearing and while under oath, Strange admitted to writing the earlier letter to petitioner and speaking to his defense counsel. She reiterated that what she told police was not what she herself witnessed or saw, but only things other people had told her. She testified that the only thing she knew "for a fact" was that she saw petitioner and Polk go into petitioner's house together, and that petitioner had a small mark on his lip about a week later.

¶ 17    In July 2007, Strange gave and signed a second written statement to defense counsel. In this statement, she said that she had reached out to police in the first place because her sister, Tiffany, was mad at petitioner. (There was significant evidence petitioner and Tiffany had a casual sexual relationship.) Strange said that her sister told her what to tell police, and she

- 4 -

obliged. In both written statements to defense counsel, Strange said she had told him the truth and, that if called to testify, she would testify consistently with her statements to defense counsel.

¶ 18    Six months later, in February 2008 and on the eve of petitioner's trial, Strange failed to appear in court despite being subpoenaed. The State asked the circuit court to issue a warrant for her arrest, and police picked Strange up a couple of weeks later. Strange remained in jail for the next few days until petitioner's jury trial began and she testified for the State.

¶ 19    At the trial—and still in custody when she testified—Strange reverted to her first story. She testified to the version she gave ASA O'Connor and police when they were first investigating Polk's murder—that she and some people confronted petitioner a few days after Polk's body was found, that his explanation kept shifting, and that he had scratches on his body. But Strange also admitted she wrote the letter to petitioner in jail and gave two statements to defense counsel.

¶ 20    Strange told the jury that she knew Polk from the neighborhood and saw her and petitioner at a liquor store near 75th Street and Cottage Grove on October 4, 2005. She spoke with them and followed them back to petitioner's house, where he retrieved a computer disk and gave it to her. At trial, Strange looked at a photo of Polk's body and said she was wearing the same clothes she had been wearing when Strange last saw her with petitioner.

¶ 21    Strange testified that, a short while after Polk's body was found, she and her sister, Tiffany, along with some friends, confronted petitioner outside his house because "he was the last person" to see Polk alive. Strange noticed a gash on petitioner's lip and a mark on his lower neck. When confronted, petitioner denied being with Polk, then claimed they had sex, then said she only had performed oral sex on him. After that conversation, Strange said she called police and told them what she saw and heard.

¶ 22 Strange also testified that police never pressured her when she spoke with them but admitted telling defense counsel that the police had been pressing her. Finally, Strange claimed that what she said in the letter to petitioner and her conversations with defense counsel were lies. She said her family was pressuring her to tell investigators that her first statement was a lie because they were upset that she had called the police on petitioner. Despite her shifting stories, Strange told the jury that she was telling the truth—specifically, that petitioner had initially denied being with Polk the night of the murder and that he had scratches on his lip and body.

¶ 23 When confronted with the letter she wrote petitioner, her January 2007 statement to defense counsel, and her July 2007 statement to defense counsel, Strange claimed she lied each time because her family was upset that she had provided information against petitioner.

¶ 24 After the State rested, the defense recalled Strange to the stand. She said that she was in custody because she had not been in court when petitioner's first trial was scheduled to start, but after she finished testifying, she was free to go and would be released.

¶ 25                              II. The State's Remaining Evidence

¶ 26 Three other pieces of evidence made up the State's case: (1) the testimony of Dr. Mitra Kalelkar, the medical examiner who performed Polk's autopsy; (2) DNA evidence to which the parties stipulated; and (3) a portion of petitioner's statement to police, which was recorded on video and played for the jury.

¶ 27 Kalelkar testified that when she received the body on October 9, 2005, it was in a "moderate" state of decomposition. Kalelkar collected Polk's fingernails to preserve them for evidence, then washed and cleaned the body for the autopsy. After she had washed it, however, she noticed two different bite marks on Polk's upper back. She admitted that she had mistakenly washed the body before she noticed the marks—meaning she could not collect any DNA

evidence from them.

¶ 28    Kalelkar found multiple stab wounds on Polk's body, as well as hemorrhages to Polk's tongue, the muscles in her neck, and her larynx. Additionally, Polk's anus was injured, full of blood, and had been stuffed up with tissue paper. Kalelkar concluded that Polk likely died on October 5, 2005 from multiple stab wounds, and that she had been strangled before her death.

¶ 29    The parties stipulated that, if called to testify, DNA analyst Kelly Biggs would say she performed a DNA analysis on Polk's fingernail clippings. She found a DNA sample on Polk's right-hand fingernail clippings that matched petitioner's DNA profile. She also found a low-level DNA profile on the right-hand fingernails, but because of the small amount of DNA in this profile, she could not determine the gender of that person or if the profile matched petitioner's. On Polk's left-hand fingernails, Biggs found a mixture of DNA, including that of the victim and one each of a female and male contributor, none of which could be connected to petitioner.

¶ 30    Last, the State played a portion of a video-recorded statement petitioner gave to police on October 26, 2006. In that statement, petitioner first told investigators he did not know Polk, much less have sex with her, and his DNA would not be found on her body.

¶ 31    But when detectives confronted petitioner with the DNA evidence they had gathered, petitioner eventually admitted that he and Polk had been drinking at his house alone on October 4, 2005. Petitioner told police he wanted to have sex with Polk, but that Polk wasn't interested. He admitted he and Polk got "feely-touchy" but, since Polk would not have sex with him, he told her to leave. Petitioner told police he last saw Polk around midnight after she left, talking and drinking with a group of people at the end of the block on 75th Street. Petitioner never confessed to hurting or killing Polk.

¶ 32    Petitioner also said to police that his face got scratched when he was in Detroit; he was so intoxicated one night that he ran into a wall. When he returned to Chicago, some people in the neighborhood told him that Polk's body had been found, with her pants pulled down and tissues in her vagina. He told the detectives that he had not told them about getting "feely-touchy" with Polk because he did not think it was important.

¶ 33                                  III. The Defense Case

¶ 34    The defense called several witnesses, including petitioner. Petitioner testified that, on October 4, 2005, he was with his cousin, Martin Murphy. He saw Polk briefly at a liquor store near his house, but then left with Murphy to drink at Murphy's place. Eventually, petitioner left to go find Polk again and see if he could hook up with her. He found her near 75th and Ellis, and they went to the liquor store, bought some alcohol, and went back to petitioner's house. Petitioner testified that he intended to have sex with Polk and that they got a little "feely-touchy," but when he realized nothing was going to happen, he asked Polk to leave. She did, walking south on 75th Street.

¶ 35    Petitioner left Chicago on October 8, the day Polk's body was discovered, and returned two days later. He admitted he lied to police when they first spoke with him, but he ultimately told them the truth. He also told the jury he believed Strange blamed him for Polk's death because he had an ongoing relationship with Tiffany, Strange's sister.

¶ 36    Murphy testified similarly to petitioner, telling the jury that he saw Polk in a liquor store the night of October 4. When he and petitioner were leaving, Polk reached out and grabbed petitioner's arm, Murphy said.

¶ 37    Constance March, petitioner's aunt, testified that petitioner and Tiffany Strange had a "special relationship," and that she once saw Tiffany and petitioner together in the basement of

her building. Tiffany appeared to be performing oral sex on petitioner, March said. Both Murphy and March testified that, in their community, Tashia Strange had a bad reputation for telling the truth. They also both said that they did not see any scratches on petitioner when he showed a group of people his body in the days after Polk's murder.

¶ 38                    IV. Verdict, Post-Trial, And Direct Appeal

¶ 39    In closing arguments, the State summed up its theory: petitioner and Polk were seen together the night before she was killed, petitioner admitted wanting to have sex with her, and when she refused, he killed her. The DNA evidence, Strange's testimony about the scratches and gash on petitioner, and petitioner's initial denials to police were proof that he killed Polk.

¶ 40    Defense counsel tried to argue that the DNA found on Polk's body could have been transferred by "perspiration," but the court sustained the State's objection and ordered the jury to ignore the comment. Despite this, counsel repeatedly emphasized Strange's ever-shifting versions of events and argued that she testified against petitioner to get out of jail.

¶ 41    The jury found petitioner guilty of first-degree murder. Petitioner then fired his trial counsel and hired new counsel, who represented him in post-trial proceedings. New counsel filed a comprehensive motion for a new trial, alleging, among other things, that trial counsel had been ineffective for various reasons, none of which are relevant to this appeal. The trial court denied the motion and sentenced petitioner to 48 years in prison. This court affirmed. *People v. Fortner*, No. 1-08-1710 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 42                    V. Postconviction Proceedings

¶ 43    Petitioner hired another attorney, his third, to represent him in postconviction proceedings. Counsel filed a postconviction petition on June 28, 2011. The circuit court first dismissed the petition but, on reconsideration, vacated the dismissal and advanced the petition to

the second stage of proceedings. Counsel then filed a series of supplemental petitions, some with affidavits and other supporting evidence.

¶ 44     In the final version of the petition, petitioner alleged his trial counsel was ineffective for, among other reasons, failing to (1) investigate evidence of an advertisement found in Polk's back pocket that was dated a day after Dr. Kalelkar said that Polk died; (2) investigate and present evidence that local gang members may have killed Polk; (3) call a DNA expert to the stand to explain that DNA can be transferred by mere contact; (4) call eyewitnesses who would have testified that petitioner had no scratches on his body and that the gash on his lip was caused when he fell into a wall; and (5) investigate the fact that prosecutors had threatened Strange with up to three years in prison if she did not testify against petitioner. Additionally, petitioner alleged that prosecutors violated *Brady v. Maryland*, 373 U.S. 83 (1963), when they did not disclose that they threatened Strange if she did not testify against him.

¶ 45     The court dismissed the petition in a written order. This appeal follows.

¶ 46                                          ANALYSIS

¶ 47     The Illinois Post-Conviction Hearing Act provides a remedy for a criminal defendant who alleges their federal or constitutional rights were substantially violated during the original trial proceedings. 725 ILCS 5/121-1 *et seq.* (West 2000); *People v. Pistonbarger*, 205 Ill. 2d 444 (2002). The Act plays out in three stages. First, the trial court determines if the petition is frivolous or patently without merit. 725 ILCS 5/122-5 (West 2000). If not, the petition advances to the second stage, where the State may either move to dismiss or answer the petition. *People v. Domagala*, 2013 IL 113688, ¶ 33. If the State moves to dismiss the petition, as here, the circuit court must decide whether the petition made a substantial showing that petitioner's constitutional rights were violated in the original trial proceedings. *People v. Dupree*, 2018 IL 122307, ¶ 29. A

"substantial showing" is "a measure of the legal sufficiency of the petition's well-pleaded allegations, which if proven at an evidentiary hearing, would entitle petitioner to relief." *Domagala*, 2013 IL 113688, ¶ 35 (emphasis omitted).

¶ 48    At the second stage, the court takes all well-pleaded facts as true and liberally construes them in petitioner's favor. *People v. Coleman*, 183 Ill. 2d 266, 285 (1998). The court does not engage in any fact-finding or credibility determinations; those are reserved for the third-stage evidentiary hearing. *Id.* The court examines the petition to determine its legal sufficiency, and any allegations not affirmatively rebutted by the record must be taken as true. *Domagala*, 2013 IL 113688, ¶ 35. Evidence is positively rebutted by the record if "a trier of fact could never accept their veracity." *People v. Robinson*, 2020 IL 123849, ¶ 60; see, *e.g.*, *People v. Sanders*, 2016 IL 118123, ¶ 48 (trial record of autopsy report showing victim was shot twice positively rebutted evidence in postconviction petition that victim was shot once). Our review of the dismissal of a petition at the second stage is *de novo*. *People v. Cotto*, 2016 IL 119006, ¶ 24.

¶ 49                    I. Trial Counsel's Ineffectiveness

¶ 50    Petitioner first argues that his petition made a substantial showing that trial counsel was ineffective for various reasons. To prevail on a claim of ineffectiveness, petitioner must satisfy the two-prong test in *Strickland v. Washington*, 466 U.S. 668 (1984). See *People v. Albanese*, 104 Ill. 2d 504 (1984). Petitioner must show that (1) counsel's performance was deficient and (2) the deficiency prejudiced him. *Strickland*, 466 U.S. at 687. Specifically, petitioner must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Domagala*, 2013 IL 113688, ¶ 36. If petitioner fails to satisfy either prong, the claim fails. *Albanese*, 104 Ill. 2d at 527.

¶ 51    Trial counsel has a professional duty to conduct reasonable investigations or make reasonable decisions that make particular investigations unnecessary. *Domagala,* 2013 IL 113688, ¶ 38; *Strickland*, 466 U.S. at 691. But to establish deficient performance, defendant must overcome the strong presumption that counsel's action (or inaction) was the result of sound trial strategy. *Strickland*, 466 U.S. at 689; *People v. Campbell*, 208 Ill. 2d 203, 217 (2003); *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007). "This means the defendant must show that counsel's errors were so serious, and his performance so deficient, that he did not function as the 'counsel' guaranteed by the sixth amendment." *Perry*, 224 Ill. 2d at 342.

¶ 52                                A. Shoe Carnival Advertisement

¶ 53    Petitioner first complains that counsel performed deficiently in failing to investigate or present evidence that the victim had a Shoe Carnival sale advertisement, dated October 6, 2005, in her back pocket when her body was found. This information was highly relevant and exculpatory, says petitioner, because the medical examiner identified the date of Polk's death as October 5, which fit neatly into the prosecution's theory that petitioner killed Polk after she spent the night with him on October 4. The fact that Polk was in possession of an advertisement dated two days after Polk's encounter with petitioner would thus contradict the State's timeline and cast significant doubt on petitioner's guilt. Counsel's failure to look into this information, says petitioner, was thus unreasonable.

¶ 54    A copy of this advertisement was not attached to the petition. Indeed, the record reveals that postconviction counsel, with the trial court's blessing (but over the State's objection), has gone to great lengths to locate the ad in the record and police files but has been unable to do so. But evidence of the advertisement is found in two police reports. First, the detective's handwritten general progress report includes a notation that "Carnival sale paper date 6 Oct 05"

was found on the victim's body. Second, the more-detailed general field investigation report states that "A newspaper sales add [*sic*] from Carnival Shoes dated 06OCT05 was located in [the victim's] rear left pant pocket." And postconviction counsel obtained a copy of a photograph of Polk's pants (either from the crime scene or the autopsy) in which the shoe advertisement is (somewhat) visible.

¶ 55    The State argues that the advertisement may not be as exculpatory as petitioner suggests—indeed, it may not be exculpatory at all. All we know of this advertisement is from the shorthand in the police reports, which states that the "date" of the ad was October 6, 2005. In the State's view, that could just as easily mean that *the sale was to take place* on October 6, 2005, but the date of the advertisement itself would have been earlier than October 6—in which case this newspaper ad may prove little or nothing.

¶ 56    The State makes a fair point. But there is a real possibility that the State's hypothesis is incorrect. It is at least as likely, probably more so, that the phrase "Carnival sale paper date 6 Oct 05" means that the newspaper, itself, was dated October 6. If a newspaper advertisement stated that a sale would occur on October 6, one would not typically describe this advertisement as being "dated" October 6. One *would* say, however, that a *newspaper* was "dated" a certain date. In any event, we need not pick the winner of these dual possibilities. We construe this evidence liberally in favor of the petition at the second stage (*Coleman*, 183 Ill. 2d at 285) and thus accept petitioner's claim that the advertisement came from a newspaper dated October 6, 2005.

¶ 57    The State also speculates that perhaps the newspaper ad was placed in Polk's back pocket after her death (by a random stranger? by petitioner, trying to mess with the timeline?). Anything is possible, but to put it mildly, reaching for that scenario is not interpreting the evidence liberally in petitioner's favor.

¶ 58    The police reports documenting the newspaper advertisement should have piqued the interest of a reasonable trial counsel, leading to at least a preliminary investigation. And the absence of any mention of this advertisement at trial (and the absence of any reference to it in trial counsel's trial file) strongly suggests that counsel failed to investigate this exculpatory evidence. See *People v. Steidl*, 177 Ill. 2d 239, 256 (1997). Liberally construed, the petition thus makes a substantial showing of deficient performance.

¶ 59    But not prejudice, says the State; petitioner cannot show a reasonable probability that evidence of this advertisement would have led to an acquittal. See *Strickland*, 466 U.S. at 695. The State writes that "[d]efendant was the last person seen with the victim, his DNA was found on the victim's fingernail clippings, and he lied to police about his involvement." All true, but petitioner admitted to having some physical contact with Polk, which could explain the DNA. And while the fact that petitioner told conflicting stories to the police is probative, we are hopefully long past the antiquated notion that only guilty people lie to the police. So while the State is correct to note these points, the evidence was by no means overwhelming.

¶ 60    The timeline, on the other hand, was an important component of the State's case. If the jury were to believe that Polk was alive on October 5, the day after spending the evening with petitioner, and in fact lived at least through part of the day of October 6, there is no denying that the State's case would be measurably weaker. It would have bolstered petitioner's claim that Polk left his house alive on the evening of October 4 and remained alive for at least another 24 hours. Petitioner has made a substantial showing of prejudice.

¶ 61    Petitioner should be given the opportunity to muster whatever proof he can at a third-stage evidentiary hearing to support this claim of ineffectiveness. It was error to dismiss this portion of the petition.

¶ 62                         B. Other Claims of Ineffectiveness

¶ 63    We uphold the trial court's rejection of the remaining claims of counsel's ineffectiveness. First, petitioner challenges trial counsel's failure to investigate and offer evidence of a dangerous, violent gang "element" in the neighborhood—specifically, the Vice Lords. Had counsel investigated these gang members, he could have argued they killed Polk.

¶ 64    In support, petitioner attached several affidavits from residents of the neighborhood. Their affidavits add little—only that members of the Vice Lords used to hang around the area, and that the victim might have hung out with them on occasion. Even taking these facts as true, they are speculation at best, insufficient to justify a claim of ineffective representation. See *People v. Holman*, 164 Ill. 2d 356, 369 (1995). Giving the petition a lenient eye at this stage is one thing, but we must see at least *some* indication that actual, exculpatory evidence exists. *People v. Dupree*, 2018 IL 122307, ¶ 38. We reject this claim.

¶ 65    Next, petitioner alleges counsel was ineffective for failing to present evidence from a DNA expert, who could have explained to the jury that DNA can be transferred from one person to the other through touching a person or object. In our previous decision, when petitioner alleged on direct appeal that his trial counsel was ineffective for stipulating to the DNA evidence rather than contesting it, we deferred to counsel's "sound trial strategy." *People v. Fortner*, No. 1-08-1710, at 15 (2010) (unpublished order under Illinois Supreme Court Rule 23).

¶ 66    We feel much the same here. Petitioner overstates the importance of this hypothetical counter-testimony. The DNA evidence here was important to prove Polk and petitioner had physical contact. But petitioner never denied that fact. He admitted he got "feely-touchy" with Polk. This is not a case, in other words, where petitioner's DNA appeared on something he claimed he never touched or placed him in a location where he denied being, and he needed

- 15 -

scientific evidence to explain what might otherwise seem unexplainable. Given the minimal benefit of the counter-evidence here, petitioner cannot overcome the presumption of sound trial strategy. Nor, for that same reason, can he show prejudice—a reasonable probability that the outcome would have been different had the jury heard this hypothetical testimony.

¶ 67    Next is petitioner's claim that his counsel failed to investigate or present eyewitnesses who could have testified that petitioner did not have any scratches on his body after the murder (contradicting Strange's testimony that he did) or that the gash on his face occurred after Polk's body was found. Again, petitioner attached several affidavits from witnesses who would have testified to both these claims.

¶ 68    Petitioner cannot establish prejudice on this point. He testified in his own defense that he received no scratches during his interaction with Polk on October 4. And two other witnesses, Marvin Murphy and Constance Marsh, corroborated that testimony; they testified that they checked petitioner for scratches on his back and found none. Any further corroboration of this point would be cumulative and only minimally helpful; it is hard to see how it would have changed the trial's outcome.

¶ 69                                    II. *Brady* Claims

¶ 70    Finally, petitioner alleges a violation of the disclosure requirement of *Brady v. Maryland*, 373 U.S. 83 (1963). He raises it both as a freestanding violation warranting a new trial and as an ineffectiveness claim against his trial counsel for failing to use the undisclosed *Brady* material as impeachment evidence.

¶ 71    *Brady* held that the prosecution's suppression of evidence that is favorable to the accused violates due process when the evidence is material to either guilt or punishment, irrespective of the good or bad faith of the prosecution. *Id.* at 87; *Coleman*, 183 Ill. 2d at 393. The duty of

disclosure applies to impeachment evidence as well as exculpatory evidence. *U.S. v. Bagley*, 473 U.S. 667, 676 (1985). A successful *Brady* claim requires showing that: (1) the undisclosed evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) the accused was prejudiced because the evidence is material to guilt or punishment. *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). Evidence is material if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *Id.* at 74; see *Bagley*, 473 U.S. at 682; *Coleman,* 183 Ill. 2d at 393.

¶ 72    Tashia Strange, as detailed above, initially gave incriminating information to the police about petitioner. She then recanted that testimony in statements, oral and written, to the defense. Initially, she failed to appear at petitioner's trial to testify. The court then issued a warrant for a body attachment, and the State took her into custody to secure her testimony. She testified at trial consistently with her original statement—that is, favorably for the State. In her affidavit attached to the postconviction petition, Strange swears that, while in custody awaiting her testimony, two assistant state's attorneys visited her, and the following conversation occurred:

"4. I told the states attorneys that I did not want to testify.

5. The states attorneys told me it was too late, that I had already made a statement, and that if I didn't testify I would be looking at one to three years for contempt.

6. I didn't want to go to prison for one to three years so I testified.

7. When Devon's attorney came to talk to me prior to my testimony, he didn't ask me if anyone had said anything to me about one to three years, or contempt, or going to jail or prison, or what would happen if I didn't testify."

¶ 73    Petitioner claims that this conversation constituted *Brady* material, and the State violated

its obligation in failing to disclose this information. The circuit court correctly noted, however, that there is a difference between telling a witness she must testify and telling her that she must testify *in the State's favor*. Strange swore only that they were coercing her to testify, which was presumably already clear to her, given that she was arrested on a body attachment and incarcerated to secure her testimony—facts that were obviously well known to the defense.

¶ 74    It was lost on no one, nor did the State make any attempt to conceal, that Strange was being compelled to testify. She was brought into court in a Department of Corrections uniform. The State asked her on direct examination (and in more detail on redirect) why she was currently in custody, to which she responded that she failed to appear originally at trial. Defense counsel pursued that point in somewhat greater depth. Nor, for that matter, was it lost on anyone that prosecutors talked to Strange in lockup before her testimony; defense counsel questioned her on that point, too, asking if she and the prosecutors "went over the statement, the written statement you gave to the police," to which Strange answered, "Yes."

¶ 75    Petitioner clearly bases his claim on the inference that, when the State was compelling her to testify, it was compelling her to testify *in the State's favor*, to revert to her original story rather than the version favorable to the defense that came later. We understand our obligation to liberally construe the evidence in favor of petitioner, which means we should be careful not to split hairs or be overly strict or technical in our interpretation. But liberal construction has its limits. There is nothing in Strange's affidavit, drafted by the defense, that claims that the State did anything other than tell her the truth—that she could be held in contempt if she refused to testify at trial. (There is no question of a fifth amendment privilege here.)

¶ 76    It would have been a relatively simple matter for the affidavit, put together by the defense after consultation with Strange, to include language to the effect that the prosecutors told her she

had to stick to her original statement to the police or face incarceration for contempt (which, of course, would not be true), or even that Strange *believed* that she had no choice but to give prosecution-friendly testimony to avoid incarceration. Something, anything along those lines, and perhaps we would have a different opinion. But that is not the record before us. And it would be unfair to the State to make that big a leap in the name of liberal construction. We thus fail to see how the State owed a duty to disclose this information.

¶ 77    Nor could we find prejudice, as required either in a freestanding *Brady* claim or an ineffectiveness claim. See *Beaman*, 229 Ill. 2d at 74 (to warrant relief for *Brady* violation, defendant must show reasonable probability that result of proceeding would have been different if evidence disclosed); *Domagala*, 2013 IL 113688, ¶ 36 (to show prejudice under *Strickland*, defendant must show reasonable probability that, but for counsel's error, outcome of proceeding would have been different). We say that because Strange's varying accounts, her reluctance to testify, and her credibility generally were explored in great deal at trial by both sides. It is hard to imagine that the disclosure of this evidence would have been anything approaching the game-changer petitioner makes it out to be. We reject petitioner's *Brady*-related claims.

¶ 78                              CONCLUSION

¶ 79    The judgment of the circuit court is reversed insofar as petitioner is entitled to a third-stage hearing on the issue of ineffective assistance of counsel for failure to investigate the issue of the Carnival Shoe newspaper advertisement. The judgment is affirmed in all other respects. We remand for further proceedings.

¶ 80    Affirmed in part, reversed in part, and remanded.